**GEORGIA ELECTRIC COMPANY,**
Petitioner,

v.

**F. Ray MARSHALL, Secretary of Labor, United States Department of Labor, and Occupational Safety and Health Review Commission, Respondents.**

No. 77–1916.

United States Court of Appeals,
Fifth Circuit.

May 21, 1979.

G. Paris Sykes, Jr., John P. Campbell, Atlanta, Ga., for petitioner.

F. Ray Marshall, Secretary of Labor, U. S. Dept. of Labor, Ray H. Darling, Jr., Executive Sec., OSHRC.

Carin A. Clauss, Sol. of Labor, Benjamin W. Mintz, Associate Sol. for OSHRC.

Allen H. Feldman, Acting Counsel, Eric W. Cloud, Atty., U. S. Dept. of Labor, Washington, D. C., for respondents.

Petition for Review of An Order of the Occupational Safety and Health Review Commission.

Before BROWN, Chief Judge, TUTTLE and THORNBERRY, Circuit Judges.

JOHN R. BROWN, Chief Judge:

In this petition for review, the Georgia Electric Company (the Company) asks us to set aside an Occupational Safety & Health Review Commission (OSHRC) order upholding the assessment of civil penalties against the Company. As a result of an Occupational Safety & Health Administration (OSHA) investigation of a fatality at a Company work site, two citations and a Notification of Proposed Penalty were issued against the Company. The citations alleged that the Company had committed (1) a willful and serious violation[1] of an

---

1. Excepting only "de minimus violations which have no direct or immediate relationship to safety or health," 29 U.S.C.A. § 658(a) requires that a citation be issued for every violation of the Act's general duty clause, 29 U.S.C.A. § 654(a), or any OSHA regulation. 29 U.S.C.A. § 666 establishes a hierarchy of possible violations, each subject to an increasingly severe penalty. The relevant portions of § 666 are as follows:

(a) Any employer who willfully or repeatedly violates the requirements of section 654 of this title, any standard, rule, or order promulgated pursuant to section 655 of this title, or regulations prescribed pursuant to this chapter, may be assessed a civil penalty of not more than $10,000 for each violation.

(b) Any employer who has received a citation for a serious violation of the requirements of section 654 of this title, of any standard, rule, or order promulgated pursuant to section 655 of this title, or of any regulations prescribed pursuant to this chapter, shall be assessed a civil penalty of up to $1,000 for each such violation.

(c) Any employer who has received a citation for a violation of the requirements of section 654 of this title, of any standard rule, or order promulgated pursuant to section 655 of this title, or of regulations prescribed pursuant to this chapter, and such violation is specifically determined not to be of a serious nature, may be assessed a civil penalty of up to $1,000 for each such violation.

\* \* \* \* \* \*

(e) Any employer who willfully violates any standard, rule, or order promulgated pursuant to section 655 of this title, or of any regulations prescribed pursuant to this chapter, and that violation caused death to any employee, shall, upon conviction, be punished by a fine of not more than $10,000 or by imprisonment for not more than six months, or by both; except that if the conviction is for a violation committed after a first conviction of such person, punishment shall be by a fine of not more than $20,000 or by imprisonment for not more than one year, or by both.

\* \* \* \* \* \*

OSHA highway construction regulation, 29 CFR § 1926.550(a)(15)[2], by permitting its employees to erect a steel light pole within ten feet of an electrical transmission line that had not been de-energized or insulated; and (2) a serious violation of the general duty clause of the Occupational Safety & Health Act (the Act), 29 U.S.C.A. § 654(a)(1)[3], by permitting its employees to operate a hydraulic crane that had a reversed loadline control lever. A hearing was held before an Administrative Law Judge (ALJ), who affirmed the citations and proposed penalties of $6,500 and $650 for the respective violations. The ALJ's decision was subsequently affirmed by OSHRC (Moran, Commissioner, dissenting). On appeal to this Court, we must determine whether there is substantial evidence to support the affirmance of the two citations. As a matter of first impression in this Circuit, we must also define the term *willful* as it is used in 29 U.S.C.A. § 666(a). Having considered these questions, we now uphold the OSHRC order.

### I. Facts

Because the facts of this case are so important, we begin with a detailed examination of the incidents leading to the citations assessed against the Company.[4] Our chronicle begins at an October 1973 pre-construction conference, touches briefly upon an April 1974 citation against the Company, and finally focuses upon the critical events of July 10, 1974, the day on which Manny Morales was electrocuted while attempting to erect a light pole along U.S. Highway No. 82.

On October 18, 1973, a pre-construction conference was held between the State of Alabama Highway Department (the Department) and the Company, an electrical contractor employing about 140–170 individuals. The conference was held to discuss matters relating to the Company's $550,000 contract with the Department to erect street lighting poles along an approximately 5½ mile stretch of U.S. Highway No. 82, near Tuscaloosa, Alabama.

Among matters discussed at this conference, the subject of OSHA compliance was raised:

> Mr. Smith [a Department representative] asked the contractor if he was familiar with OSHA and Mr. Simmons [a Company representative] said, "Yes sir". Mr. Smith said, "I think most everybody is". Mr. Smith also stated that "we don't get into a lot of enforcement on safety yet, we just haven't gotten, really, we don't know how much to enforce this, that and the other, etc., but we have this little

---

(j) For purposes of this section, a serious violation shall be deemed to exist in a place of employment if there is a substantial probability that death or serious physical harm could result from a condition which exists, or from one or more practices, means, methods, operations, or processes which have been adopted or are in use, in such place of employment unless the employer did not, and could not with the exercise of reasonable diligence, know of the presence of the violation.

\* \* \* \* \* \*

The violations are not necessarily mutually exclusive. For example, in this action, the Company was cited for committing both a serious and a willful violation of 29 CFR § 1926.-550(a)(15). The "serious" aspect of this citation is uncontested on this appeal and will not be considered further.

2. 29 CFR § 1926.550(a)(15) provides in pertinent part:
   (15) Except where electrical distribution and transmission lines have been de-ener-

gized and visibly grounded at point of work or where insulating barriers, not a part of or an attachment to the equipment or machinery, have been erected to prevent physical contact with the lines, equipment or machines shall be operated proximate to power lines only in accordance with the following:
   (i) For lines rated 50 kV. or below, minimum clearance between the lines and any part of the crane or load shall be 10 feet. . .

3. 29 U.S.C.A. § 654(a)(1) provides as follows:

   **Duties of employers and employees**

   (a) Each employer—

   (1) shall furnish to each of his employees employment and a place of employment which are free from recognized hazards that are causing or are likely to cause death or serious physical harm to his employees . . .

4. The ALJ's findings of fact are, in all important respects, undisputed.

booklet, you may have one, I don't know, it's entitled, 'An Informational Guide on Occupational Safety on Highway Construction Projects' ".[5]  Mr. Smith said, "Do you have this?"  Mr. Simmons said, "I don't know whether we have that or not, but I imagine so".  Mr. Smith said, "If you don't have, you can get that from our Montgomery Office and it is possible we can get you one.  I don't have an extra one myself."

App. at 363.

The subject of compliance with federal job safety standards was also treated in the contract between the Company and the Department:

V.  SAFETY;  ACCIDENT PREVENTION

In the performance of this contract, the contractor shall comply with all applicable Federal, State and local laws governing safety, health and sanitation.  The contractor shall provide all safeguards, safety devices and protective equipment and take any other needed actions, on his own responsibility, or as the State highway department contracting officer may determine, reasonably necessary to protect the life and health of employees on the job and the safety of the public and to protect property in connection with the performance of the work covered by the contract.

*Id.* at 376.

Subsequently, in April 1974, the Company was provided with a copy of the OSHA safety and health regulations for the construction industry, Part 1926 of Title 29 of the Code of Federal Regulations, including section 1926.550(a)(15).  The material was supplied as part of an OSHA investigation of an electrocution that occurred on April 8, 1974, at a Company work site in Albany, Georgia.  As a result of that investigation, the Company was cited for allowing an employee to work too near an electric power circuit that had not been de-energized or otherwise guarded.  The Company was charged with a serious violation of 26 CFR § 1926.400(c)(1).  The charge was uncontested, and the Company paid a $500 fine.

Meanwhile, work was progressing at the Highway No. 82 project site, where Job Superintendent Hugh L. Bronson conducted weekly safety meetings with the employees.  The meetings were concerned with a variety of matters affecting employee safety.  At the meetings, the employees were warned to be careful in erecting light poles near electric power lines but were not given specific instructions on the subject.

The accident from which the instant citations stem occurred on July 10, 1974.  On that day, a four-man pole-setting crew had been assigned to erect steel light poles along Highway No. 82.  The pole-setting crew consisted of a boom truck operator who worked the various levers controlling the truck's pole-setting equipment and three other crew members who performed on-the-ground functions such as guiding the poles onto the concrete bases and securing the poles to the bases.  A fifth person also worked with the crew as a flagman, but he had no responsibility for erecting poles.

On the morning of the fatal accident, D. R. Carroll, the regular boom truck operator for the pole crew, did not report for work.  Lamar Carroll, the job foreman and the son of D. R. Carroll, assigned Harold Lee as the replacement operator for the day.  The foreman gave the day's instructions to two other members of the crew, Robert Humphreys and Manny Morales.  The foreman told them that the crew was to begin erecting poles at the far end of the project and work backwards towards the project headquarters, setting as many poles as the crew "thought they could set."  He further told them to "stay away" from power lines and advised them that they might not be able to erect the first pole across the river.  The ultimate decision of whether to erect the pole or not, however, was up to the crew.[6]

---

5.  The manual, "An Informational Guide on Occupational Safety on Highway Construction Projects," contained in at least two places provisions virtually identical to § 1926.550(a)(15).

6.  Examination of Lamar Carroll:

A  Well, when they left I told them to check that pole, and if they thought they had the

Foreman Lamar Carroll had several reasons to be concerned about this first pole across the river. In the first place, he knew that his father D. R. Carroll had previously foregone erection of that pole because he had felt that it was too close to overhead live wires. Moreover, on the morning of the accident, Assistant Project Manager Robert Jack McDaniels had cautioned Foreman Carroll not to attempt to set poles that had been skipped previously.[7] At the same time, Job Superintendent Hugh L. Bronson gave a similar warning, telling Carroll not to set any poles near energized lines since the regular boom truck operator was absent.[8]

All of the above was consistent with the Company's usual procedure, which was for the pole-setting crew to skip those poles that were too close to live power lines until arrangements could be made to de-energize those lines.[9] There were not, however, any precise guidelines as to what distance was "too close." Although Foreman Lamar Carroll testified that it was taken for granted that the length of the pole's cross-arm provided the limitation,[10] there was no such general rule.[11] Instead, as the testi-

clearance to go ahead, and if they didn't have the clearance, to leave it alone again. . .

THE COURT: In other words, the erecting crew was left on it's own to make their own judgment on the spot, so to speak?
A Yes, sir.
App. at 260.

7. Examination of McDaniels:
Q Well, now, who—had you told anybody that, to stay away that far from the transmission lines?
A Yes, sir. In fact, the—we had talked about that that same morning.
Q Who did you tell?
A Lamar Carroll. I cautioned him about it in the morning this happened.
Q What did you say to him?
A I told him to be real careful and stay off the poles that we had already left. In other words, these were previous poles that had been skipped.
Q Did you know—were you aware that this yourself, that this particular pole had been skipped?
A Yes, sir, the pole had been laying there about six weeks.
Q And you know why it had been laying there?
A Yes. Too close to the power lines.
*Id.* at 155–56.

8. Examination of Bronson:
Q Do you recall the date of this—the accident, on July 10th, 1974?
A Yes, sir.
Q Did you have any conversation with the foreman or anyone on the morning before the crew left the yard to go out to the job?
A Yes, sir.
Q And who did you have this conversation with?
A Well, it was sort of a three-way conversation between Lamar Carroll, and Mr. McDaniels and myself.

\*    \*    \*    \*    \*    \*

Q [W]hat was your conversation about?

A Well, Lamar Carroll, he was the foreman in charge of the crew, and he came over and told us that the regular operator for the truck was off sick that morning. He was going to use this Harold [Lee]. He had been helping operating the truck and had operated the truck some quite a bit to set the poles.

\*    \*    \*    \*    \*    \*

Q And what else did he say; what was the rest of the conversation?

A Well, I asked him if Harold—if he was sure that Harold could operate the truck all right, and he said yes, and I agreed with him because I had seen him operating it some. I think Mr. McDaniels mentioned it first, and he said yes, but be careful. Don't set any poles near any hot lines. I either said it first, or Mr. McDaniels, but we both said it anyway in the conversation.

\*    \*    \*    \*    \*    \*

Q What was the nature of those instructions?

A Due to the fact that the regular operator was off, do not attempt to set any poles close to any power lines.

Q Did you mention any distances?

A I didn't mention any distances.

*Id.* at 188–89, 189–90, 212.

9. On three previous occasions, Alabama Power Company had been called to the project site to de-energize or insulate electrical lines. On one of these occasions, Alabama Power Company was called in when the light pole was to be erected within eight feet of energized power lines.

10. App. at 232, *quoted at* note 14, *infra.*

11. *Id.* at 190–91, *quoted at* note 13, *infra.*

mony of McDaniels,[12] Bronson,[13] Lamar Carroll,[14] and Lee [15] shows, the Company employees were merely to use their "common sense" in determining whether a pole

12. The Company's "common sense" policy permeated the entire chain of command at the Highway No. 82 project. Thus, Assistant Project Manager McDaniels, the highest ranking employee at the project site, responded to questioning as follows:

Q What sort of working rules did you have with respect to setting of poles, in keeping away from overhead power transmission lines?
A Well, what those boys had been working on there, due to the long arms and whatnot on these particular poles, they had been advised if they were close enough to get into the—into the—into any energized lines, just to leave them. Do not attempt to set them.
Q What do you mean by close enough?
A If the arm, if your arm, if you were close enough for your arm to swing, or your pole to get into it after you tried to get it in the vertical position to set it, to leave it be. We didn't want to attempt to try to set them, any under those conditions.

\* \* \* \* \* \*

Q Were you familiar with—had you ever heard of the OSHA standard of ten foot clearance?
A I hadn't until all this came up on it. That metal pole that was commonsense, if you could reach it stay away from it.

*Id.* at 154–55, 171.

13. Superintendent Bronson's testimony is similar to McDaniels's in all respects:

Q Well, what are near and close enough?
A Well, near enough or close enough for it to be danger to you, dangerous.
Q Well, how near is that?
A Well, it depends . . . .

\* \* \* \* \* \*

Q Did you all have an understanding or arrangement or agreement, or any information that would indicate that the length of the crossarm would be the proper distance to stay away from it, the length of the arm on the light pole?
A No, sir. We didn't have any understanding as to that, no, sir.
Q Had you ever mentioned that, had you ever discussed working near transmission lines in any of the safety meetings?
A Yes, sir.
Q Did you ever mention there what near was, or how near you could come?
A I can't recall if we had mentioned any feet, just used common sense in being safe.

\* \* \* \* \* \*

Q Now, did you have any agreement with, or had you told Mr. Lamar Carroll when—how close a pole was to the line before you had to be—how close it had to be before you would call Alabama Power Company to come out there?

A No, sir. There was, to my knowledge, there hadn't been any particular distance mentioned there. Just anything using common sense that looked dangerous we are supposed to call Alabama Power.

\* \* \* \* \* \*

Q Had you ever been handed a copy of the regulations?
A No, sir.
Q Had you ever seen the—a copy of the regulations?
A No, sir.
Q Had anybody with your company ever said anything to you about any distance you are supposed to keep, stay away from high voltage transmission lines?
A Not specifically, no, sir.
Q Well—
A Just use common sense and stay out of the line, mainly.
Q This common sense, did anybody ever say anything to you with respect to what that would mean in terms of distance?
A I just—I don't think. I think that to use your own common judgment, really.

*Id.* at 190–91, 195, 201–202.

14. Foreman Carroll's testimony is entirely consistent with that of his superiors:

Q Had you been told previously what working near or working around power lines, or how far away from one not to work?
A Not any certain distance, no, sir.
Q Had anybody said anything to you about not working within the length of the arm from the power pole?
A That is what we just took for granted. If we thought the arm hit it, we didn't usually fool with the pole.

\* \* \* \* \* \*

Q Were you aware that there was any such thing as an OSHA standard that related to the number of feet you should stay away from a power line with a boom truck?
A No, sir.

*Id.* at 232, 243.

15. The testimony of Harold Lee, the boom truck operator on the day of the accident, completes the picture:

Q [H]ad anybody said to you what was too close?
A No, sir. . . .
Q Had anybody said anything to you at all about how far you ought to stay away, or had measured the distance by the length of the arm on the pole?
A No, sir.
Q Had anybody said that you shouldn't set one within the reach of the arm of the pole?
A No, sir.

*Id.* at 278.

was too close to overhead wires. None of the parties involved in the July 10, 1974 accident was aware of the OSHA regulation providing for a specific clearance requirement.[16]

The replacement operator, Harold Lee, was a twenty-year-old college student, a summer employee who had been working for the Company for approximately two months. Lee had assisted in the erection of approximately 24 poles. He had also operated the boom truck to erect from 6 to 21 poles, but he had only done so under the supervision of the regular truck operator. Lee had not been informed of any specific minimum clearance distance within which he must not operate the crane near an energized power line. On the day of the accident, the only instructions Lee personally received from the foreman were that he was to operate the boom truck and that Robert Humphreys knew where to erect the poles.

In addition to Lee, the other members of the pole crew were David Snodgrass, Manny Morales, and Robert Humphreys. Like Lee, Snodgrass had worked for the Company for about two months. Humphreys and Morales had worked for the Company for about four or five weeks. These men were either college students, like Lee, or school teachers who were working for the Company for the summer.

As the crew left the yard to commence work, Lee asked Humphreys where they were to begin. Apparently failing to convey the foreman's instructions in their entirety,[17] Humphreys informed Lee that the crew was to cross the river and set all the poles they thought they could set.

Lee crossed the river and stopped the boom truck at the first pole across the river. Snodgrass leapt from the truck and began to tie a nylon strap to the pole so it could be attached to a cable for lifting. Humphreys left the truck and proceeded to clean the mud off the pole.

Lee noticed the overhead transmission lines and told the crew that they did not have to erect the pole since it was too close to the lines. Lee was aware that D. R. Carroll had skipped this pole because it was too close to the transmission lines. Humphreys and Snodgrass[18] indicated their willingness to erect the pole anyway.

The pole, including its 18 foot crossarm and light, rose to a height of approximately 50 feet. The transmission lines were located 50 feet above ground level.[19] The lateral distance between the outside transmission line (the *A* phase line, see note 19) and the concrete base for the light pole was approximately 4½ feet. The transmission lines were not grounded, and no insulating barriers were used. At no time were efforts taken to de-energize the lines before erecting the pole.

Meanwhile, as the pole-setting crew was in the process of preparing to erect the pole, Foreman Lamar Carroll drove past the crew. He parked his truck about 100–125 feet from the crew. He looked briefly at the pole-setting crew, but he was thinking about matters involving other crews under his supervision.[20] Although Carroll observed what seemed to be a narrow distance between the power lines and the pole, Car-

16. *Id.* at 171, 201–202, 243, 270, *quoted at* nn. 12–15.

17. Instead of starting at the far end of the project, where there were no power lines at all, and working back towards project headquarters, as instructed, the crew apparently worked in the opposite direction.

18. According to Lee's testimony, Snodgrass had not at this point noticed the overhead wires. He apparently thought Lee was referring to another set of wires farther away.

19. The overhead transmission lines consisted of three wires referred to as phases *A*, *B*, and *C*

and a fourth wire referred to as a *neutral*. The voltage in the transmission line of any two of the three phases was 12,000 volts. The voltage from the *A* phase line to the ground was approximately 7,200 volts.

20. In addition to the pole-setting crew, Lamar Carroll was foreman over about four crews performing functions other than pole-setting. The foreman regarded the pole-setting as the simplest work going on at that time. He normally spent about one-half hour a day with the pole crew. App. at 261.

roll assumed that the crew had checked the clearance and found it adequate.

The crew proceeded to raise the pole upright. The pole was to be swung upright by means of a cable attached to the truck's boom, a hydraulic crane. "Claws" or "dogs" at the end of the boom would then be locked around the pole to hold it straight. As the pole was raised, to prevent the pole from swinging, the three members of the crew on the ground would usually hold the pole in place. As the "dogs" closed on the pole, the crew would maneuver the pole towards the concrete base and twist it into the base.

Lee cautioned the crew to hold the pole to prevent it from swinging. As they started to raise the pole, Snodgrass noticed the overhead transmission lines and expressed some doubt about erecting the pole. Lee got off the truck, walked around, and asked Snodgrass what he wanted to do. Snodgrass agreed to go ahead with the job.

The pole was raised straight up. As the "dogs" were closed around the pole, the pole started to rotate. As the pole twisted, the crossarm extending from the vertical shaft touched the overhead *A* phase wire.

Lee immediately pushed the boom's loadline control upward to lift the pole clear of the line. Unfortunately, Lee had momentarily forgotten that the control panels were reversed, so that contrary to the directions marked on the control panel, when the lever was moved upward the boom and hence the pole were lowered. Lee, as well as D. R. Carroll and Robert Snodgrass, was aware that the loadline lever was reversed, but in his haste, Lee had forgotten. Manny Morales was electrocuted when the pole was lowered onto the line.

## II. Willful Violation of 29 CFR § 11926.550(a)(15)

### A. The Meaning of Willfulness

■ Under the Act's penalty scheme, a willful violation is subject to the most severe sanctions—a civil penalty of up to $10,-000 and the possibility of imprisonment if an employee's death results from the employer's violation. 29 U.S.C.A. § 666(a), (e), *quoted at* n. 1, *supra*. The word *willful* is not, however, defined in the Act, and the instant case presents the first occasion for this Circuit to consider the meaning of the statutory term.

The Secretary of Labor (the Secretary), respondent in this action, urges us to adopt OSHRC's definition of willful conduct. Under this definition, *willful* means an act done voluntarily, with either an intentional disregard of, or plain indifference to, OSHA requirements. General Electric Co., 1977, 5 OSHD 1448, 3 Empl.Safety & Health Guide (CCH) (1977–78 Occup.Safety & Health Dec.) ¶ 21,853; Kent Kowlin Constr., Inc., 1977, 5 OSHD 1051, 3 Empl.Safety & Health Guide (CCH) (1977–78 Occup.Safety & Health Dec.) ¶ 21,550. *See also* C.N. Flagg & Co., 1974, 2 OSHD 1195, 1 Empl. Safety & Health Guide (CCH) (1974–75 Occup.Safety & Health Dec.) ¶ 18,686 (*Willful* means "intentional, knowing, or voluntary as distinguished from accidental conduct and may be characterized as conduct marked by careless disregard.").

The majority of Circuits that have considered the question of the meaning of *willfulness* have adopted the OSHRC approach. For example, in *Intercounty Construction Co. v. OSHRC*, 4 Cir., 1975, 522 F.2d 777, *cert. denied*, 1976, 423 U.S. 1072, 92 S.Ct. 854, 47 L.Ed.2d 82, the Fourth Circuit upheld a finding of a willful violation where an employer had failed to shore up a trench as required by OSHA regulation. The Court emphasized the employer's disregard of the OSHA standard:

> We agree with the position adopted by the Commission in interpreting the statute that "willful" means action taken knowledgeably by one subject to the statutory provisions in disregard of the action's legality. No showing of malicious intent is necessary.

*        *        *        *        *        *

Regardless of any good-faith belief that the work area remained safe the fact is that the company knowingly chose not to comply with the OSHA regulations

and requirements. That decision was a willful action in violation of the law. *Id.* at 779–80.

In *Western Waterproofing Co. v. Marshall*, 8 Cir., 1978, 576 F.2d 139, *cert. denied*, —— U.S. ——, 99 S.Ct. 452, 58 L.Ed.2d 423, the Eighth Circuit took much the same approach. The Court rejected the employer's defense that although it had failed to comply with a particular OSHA standard, it had nevertheless met the "underlying purpose" of the standard:

> Western's officials substituted their own judgment for the provisions of the standards and therefore cannot escape the conclusion that they acted voluntarily with either intentional disregard of, or plain indifference to, the requirements of the Act.

*Id.* at 143. Finding that the evidence showed a "conscious decision" not to use the required protective devices, the Court held that this showed a willful violation of the OSHA standard. *Id.*

Similarly, in *F. X. Messina Construction Corp. v. OSHRC*, 1 Cir., 1974, 505 F.2d 701, the First Circuit upheld a citation for a willful violation where the employer's foreman had failed to order workers to shore up certain trenches as required by OSHA standards:

> [The foreman] neither ordered shoring nor returned to the trench . . . . Such indifference to the requirements of law may alone represent a willful statutory violation . . . ., and is not met by [the foreman's] private determination that in this case it would not be dangerous. The regulation unambiguously forecloses such discretion.
>
> \* \* \* \* \* \*
>
> Petitioner, through its foreman, made its choice, a conscious, intentional, deliberate, voluntary decision, which, regardless of a venial motive, properly is described as willful.

*Id.* at 702 (citations omitted). *See also Empire-Detroit Steel Division v. OSHRC*, 6 Cir., 1978, 579 F.2d 378; *United States v. Dye Construction Co.*, 10 Cir., 1975, 510 F.2d 78.

The Company, however, asks us to adopt the position of the Third Circuit in *Frank Irey, Jr., Inc. v. OSHRC*, 3 Cir., 1974, 519 F.2d 1200, *aff'd*, 1975, 519 F.2d 1215 (en banc), *affirmed on other grounds sub nom. Atlas Roofing Co. v. OSHRC*, 1977, 430 U.S. 442, 97 S.Ct. 1261, 51 L.Ed.2d 464. There, the Court required a showing of "bad purpose" to support a finding of a willful violation of an OSHA standard:

> Willfulness connotes defiance or such reckless disregard of consequences as to be equivalent to a knowing, conscious, and deliberate flaunting of the Act. Willful means more than merely voluntary action or omission—it involves an element of obstinate refusal to comply.

*Id.* at 1207.

The Company argues that this construction is necessary in order to preserve the Act's scheme of graduated penalties, under which a willful violation brings with it a penalty ten times more severe than that accompanying a serious violation.[21]

We disagree with the Company's argument. In the first place, the "bad purpose" requirement is not necessary to preserve the distinction between serious and willful violations. To prove a willful violation, the Secretary must show that the employer acted voluntarily, with either intentional disregard of or plain indifference to OSHA requirements.[22] To prove a serious violation, a quite different showing need only be made. The gravamen of a serious violation is the presence of a "substantial probability" that a particular violation could result in death or serious physical harm. Whether the employer intended to violate an OSHA standard is irrelevant. The only question relevant to the employer's state of mind is

---

**21.** A serious violation is defined in 29 U.S.C.A. § 666(j), *quoted at* note 1, *supra.*

**22.** This of course does not mean that every act consciously done is done willfully. The "extra

ingredient" needed for willfulness is either the element of intentional disregard or plain indifference.

whether he knew or with the exercise of reasonable diligence could have known of the violation. See 29 U.S.C.A. § 666(j).

We also reject the Company's "bad purpose" test because we feel that it would unduly restrict OSHA's authority to impose its most severe sanction.[23] *Accord, Intercounty Const. Co. v. OSHRC*, 522 F.2d at 780. We do not feel that such a result would well serve the Congressional purpose of creating a strong and effective federal job safety statute.[24] Instead, we feel that the purposes of the statute are better served by adopting the test suggested by the Secretary. Thus, for OSHA purposes,[25] we define a willful violation as one involving voluntary action, done either with an intentional disregard of, or plain indifference to, the requirements of the statute.

### B. The Evidentiary Issue

■ Having accepted the Secretary's definition of *willful*, we do not end our inquiry. We must next determine whether there is substantial evidence to support the OSHRC finding that the Company willfully violated 29 CFR § 1926.550(a)(15).

Adopting the ALJ's decision, OSHRC ruled that the Company's indifference to OSHA requirements, coupled with its disregard for the safety of its employees, supported a finding of a willful violation of the OSHA regulation. We agree.

There was sufficient evidence to support a finding that the Company acted with almost complete indifference to the Act and its regulations. The Company was certainly aware of its duty to conform and had had ample opportunity to acquaint itself with OSHA's requirements. The Company's contract with the Department *required* that it comply with all federal safety laws. At the pre-construction conference, the Company responded affirmatively to questions regarding its familiarity with OSHA. Moreover, the Company was specifically advised to obtain a booklet containing the federal safety requirements for highway construction projects. Subsequently, the Company was even given a copy of the OSHA regulations regarding the construction industry. At the same time, the Company was cited for allowing an employee to work within too close a proximity to a charged electrical panel. Although not a violation of the identical provision cited here, this violation surely should have made the Company cognizant both of the dangers of allowing its employees to work too close to live electric circuits and to the fact that there were OSHA regulations on the subject that had to be followed.

Despite its awareness of its obligation to conform to the Act and regulations promulgated thereunder, the Company never made any effort to acquaint its supervisory personnel with the OSHA standards. Not one employee with responsibility for the Highway No. 82 project was aware of the minimum distance requirements of § 1926.-550(a)(15).[26] See note 16, *supra*, and accom-

---

**23.** Indeed, as the Sixth Circuit has said of another federal safety statute, if a requirement of "bad purpose" or "evil motive" were read into the statute, it would be virtually impossible to establish a violation of the Act:

We do not consider the phrases "bad purpose" and "an evil motive" to be appropriate in this action. [The Federal Coal Mine Health and Safety Act of 1969, 30 USCA § 801 *et seq.*] is a safety Act and it would be virtually impossible to establish violations if this rule were followed.

*United States v. Consolidation Coal Co.*, 6 Cir., 1974, 504 F.2d 1330, 1335, *quoted in Empire-Detroit Steel Division v. OSHRC*, 579 F.2d at 385.

**24.** For the legislative history of the Act, see 1970 U.S.Code Cong. & Admin.News pp. 5177–5241.

**25.** We wish to emphasize that the meaning of *willful* varies with the context in which the word is used. *Spies v. United States*, 1943, 317 U.S. 492, 63 S.Ct. 364, 87 L.Ed. 418; *United States v. Murdock*, 1933, 290 U.S. 389, 54 S.Ct. 223, 78 L.Ed. 381. Thus, the construction given to the word *willful* in other contexts, while interesting, is not determinative of the construction to be given here. Instead, we must consider .the particular statute and the purposes it is intended to serve.

**26.** Since none of the actors in this case was aware of OSHA's minimum distance requirement, we need not decide to what extent or how far down the chain of command awareness of the specific OSHA regulation should have gone.

panying text. Instead, employees were expected merely to use their "common sense" and not get "too close" to live wires.

The Company seeks to turn this fact to its advantage, claiming that it cannot be held liable for willfully violating provisions of which it was unaware. This misses the point. It is precisely because the Company made no effort whatsoever to make anyone with supervisory authority at the job site aware of the OSHA regulation that the Company can be said to have acted with plain indifference and thereby acted willfully. A company may not, practically as a matter of policy, altogether ignore its known OSHA duties and then plead ignorance when it is caught in violation of an OSHA regulation.[27]

The Company's other defenses must also fail. In the first place, we reject the Company's "employee misconduct" defense. *Cf. Horne Plumbing & Heating Co. v. OSHRC*, 5 Cir., 1976, 528 F.2d 564. Here, the job foreman, Lamar Carroll, did not disobey instructions by telling the pole-setting crew to set all the poles they thought they could set and by standing by while the crew attempted to raise the pole. Rather than acting contrary to Company policy, Carroll was merely following the Company's laissez-faire "common sense" approach.

The Company's position is also unaided by the fact that it conducted weekly safety meetings with its employees. See p. 313 *supra.* The record fails to show that any effort was made at these meetings to promote OSHA compliance. Indeed, if anything, the meetings evidence the perpetuation of the Company's ignorance-is-bliss policy.

Another factor considered in OSHRC's finding of willfulness was the Company's apparent indifference to employee safety. While not in compliance with the federal safety standards, the Company's "common sense" approach might at least have kept from harm the Company's experienced personnel, such as the regular boom truck operator, D.R. Carroll. But, when the "policy" was extended to include novices such as Harold Lee and the other members of his crew, the "common sense" policy became meaningless. Inexperienced employees would not ordinarily have the sort of "common sense" that comes with job familiarity. These employees needed more specific guidance from the Company, yet the Company provided none. Indeed, even when the crew approached a pole that the foreman knew had been previously skipped as too close to overhead live wires, the foreman merely looked on and allowed the inexperienced crew to proceed, assuming that such a crew could have and had made an informed decision as to whether the pole was dangerously close to the overhead wires.[28] Such a course of conduct could be taken into account in determining that the Company had acted willfully in violating the OSHA standard. A purposeful, that is, not accidental, indifference to general safety considerations goes a long way in justifying the conclusion of like indifference to specific OSHA standards which ought to have been, but were not, known.

### III. Serious Violation Of The General Duty Clause, 29 U.S.C.A. § 654(a)(1)

With respect to the citation stemming from the reversed loadline lever, the Company argues that there is insufficient evidence to support a finding of a serious violation of OSHA's general duty clause, 29 U.S.C.A. § 654(a)(1). See note 3, *supra*. To establish a violation of the general duty

---

27. This case is unlike those cases in which a willful violation was upheld when supervisory personnel knew of the OSHA regulation in question but felt for some reason that strict compliance was not necessary in the particular case. *See e. g., Western Waterproofing Co. v. Marshall*, 576 F.2d at 143; *Intercounty Construction Co. v. OSHRC*, 522 F.2d at 780. The instant case is arguably more serious than those. Here, the Company powers-that-be had not even given their employees a chance to conform since they had made no effort to acquaint anyone with the OSHA regulations.

28. We reiterate, however, that although perhaps not all it should have been, the foreman's conduct does not lend support to the Company's "employee misconduct" defense.

clause, the Secretary must prove that (1) the employer failed to render its work place free of a hazard; (2) the hazard was "recognized"; and (3) the hazard caused or was likely to cause death or serious physical harm. *Getty Oil v. OSHRC*, 5 Cir., 1976, 530 F.2d 1143, 1145. Moreover, (4) the hazard must be preventable. *Id.*

■ OSHRC could properly conclude that the reversed lever constituted a hazard. It is undisputed that the loadline lever worked in the opposite direction from the control panel markings. When the lever was moved to the "raise" position, the crane was lowered, and when it was moved to the "lower" position, it was raised.

The Company makes much ado about whether the reversed lever was due to "mislabeling" or "malfunctioning" and about whether there was proof in the record that the lever should "normally" be pushed up or down to raise the crane. As we see it, however, most of this argument misses the point. It didn't matter whether it was mislabeled or malfunctioned. In either case— and known to the person responsible for its operation—the lever worked in the opposite direction from the markings on the control panel. This in and of itself presented the potential for harm, for, as the ALJ stated, "[p]roper marking assists the inexperienced operator and eliminates the human error factor." App. at 38. Here, the boom truck operator knew about the reversal and ordinarily compensated for it, but the hazard was nonetheless present because a momentary lapse in concentration, particularly likely in a panic situation, could have resulted in, and in fact did result in, very serious consequences.

There is substantial evidence to show that the hazard was "recognized." A recognized hazard is one that is known to be hazardous:

A "recognized hazard" is a condition that is "known to be hazardous." This element can be established by proving that the employer had actual knowledge that a condition is hazardous. *Brennan v. O. S. H. R. C. and Vy Lactos Laboratories*, 494 F.2d 460, 463–464 (8th Cir. 1974). It may also be shown by proving that the condition is generally known to be hazardous in the industry. Thus, whether or not a hazard is "recognized" is a matter of objective determination. It does not depend upon whether the particular employer appreciated that the reversed lever was a recognized hazard in industry. *National Realty & Const'n. Co. supra.*

OSHRC Order, App. at 66–67.

Here, OSHRC imputed to the Company the regular boom truck operator's actual knowledge that the lever was reversed, and from this knowledge it imputed to the Company recognition of the hazard. The ALJ found that the employer had delegated supervisory authority to the regular boom truck operator, D.R. Carroll. Although Carroll's job title was not that of a superintendent or foreman, there is sufficient evidence to show that he in fact exercised supervisory authority.[29] Therefore, D.R. Carroll's knowledge could be imputed to the Company.

Relying on the District of Columbia Circuit's opinion in *National Realty & Construction Company v. OSHRC*, 1973, 160 U.S.App.D.C. 133, 489 F.2d 1257,[30] the Company argues that D.R. Carroll's knowledge could not be imputed to the Company because Carroll's status as a supervisory employee was not litigated below. We do not read *National Realty* as supporting that argument. In that case, OSHRC made speculative arguments based upon extra-record facts. Here, however, the question of Carroll's job duties *was* litigated, and the

**29.** In the words of Superintendent Bronson, D.R. Carroll was a "working foreman." App. at 221. He was in charge of the pole crew and decided which poles would be erected. He was for the most part in charge of the crew since the job foreman, Lamar Carroll, had several other crews to supervise and spent less than one-half hour a day with the pole crew.

**30.** There, the Court stated: "It is patently unfair for an agency to decide a case on a legal theory or set of facts which was not presented at the hearing." *National Realty & Construction Co. v. OSHRC*, at 143 n. 40, 489 F.2d at 1267 n. 40.

facts upon which the ALJ based his findings were in the record. To the extent that the Company felt that these facts were inaccurate or misleading, it had ample opportunity to rebut or otherwise challenge them at the hearing. Thus, as OSHRC correctly pointed out, the ALJ did not supply a missing element in the Secretary's case. The ALJ merely put a legal characterization upon facts established in the record.

OSHRC could properly adopt the ALJ's finding that the hazard was one that was likely to cause death or serious harm:

> The hazard associated with the reversed control was such as to be likely to cause death or serious physical harm. A death actually occurred from the reversed control. This is convincing evidence of the seriousness of the hazard. An accident was always possible. The loadline control was used to raise the poles. The poles were of steel and weighed between 700 and 800 pounds. The possibility always existed that the control could have been moved in the wrong direction and caused a pole to fall on the employees. In such an event, the resulting accident would have caused death or serious physical harm.

Decision of the ALJ, App. at 40.

Finally, there was no error in the finding that the hazard was preventable, whether through reversing the label on the control panel or reversing the operation of the lever itself. That repair was feasible is indicated by testimony that Superintendent Bronson intended to have the truck repaired. *Id.* at 131–32. At any rate, even if the equipment could not have been repaired, danger could have been avoided simply by not using the defective equipment.

The seriousness of the violation of the general duty clause has also been satisfactorily proven.[31] In this case, the evidence supporting the finding that the hazard was likely to cause death or serious bodily harm supports the requirement of 29 U.S.C.A. § 666(j) that there be a "substantial probability" that death or serious physical harm could result from the questioned condition. Moreover, that the Company "recognized" the hazard of the reversed levers shows in this case that the Company knew, or "with the exercise of reasonable diligence could have known," of the violation of the general duty clause.[32] Thus, all the elements necessary to prove a serious violation of the general duty clause have been satisfactorily established.

### IV. Conclusion

We conclude that OSHRC properly found that the Company had committed a willful and serious violation of 29 CFR § 1926.550(a)(15) and a serious violation of 29 U.S.C.A. § 654(a)(1). We also find that, having properly evaluated the relevant factors in assessing penalties for the violations,[33] OSHRC did not abuse its discretion in upholding the assessment of civil fines of $6,500 and $650 for the respective violations. *Cf. Southwestern Bell v. Secretary of Labor*, 5 Cir., 1978, 568 F.2d 368.

The OSHRC order is ENFORCED.

---

**31.** For the statutory definition of a serious violation, see note 1, *supra.*

**32.** The Company makes a void-for-vagueness challenge to the application of the general duty clause, arguing that there was nothing in the facts to put a person of reasonable intelligence on notice that the reversed loadline lever was forbidden under the general duty clause. We

disagree. In light of the potential danger in operating a crane, known to be defective, within close range of live power lines, the Company was given adequate notice that such might violate the general duty clause.

**33.** See 29 U.S.C.A. § 661(i).