**PEABODY COAL COMPANY,**
Appellant–Petitioner,

v.

**INDIANA DEPARTMENT OF NATURAL RESOURCES, Appellee–Respondent.**

**No. 77A01–9307–CV–233.**

Court of Appeals of Indiana,
First District.

March 2, 1994.

Rehearing Denied April 25, 1994.

David R. Joest, Henderson, KY, for appellant-petitioner.

Pamela Carter, Atty. Gen., Myra P. Spicker, Deputy Atty. Gen., Dept. of Natural Resources, Indianapolis, for appellee-respondent.

ROBERTSON, Judge.

The Peabody Coal Company appeals the trial court's decision to grant relief on the petition of the Indiana Department of Natural Resources [DNR] for judicial review of the decision of the Administrative Law Judge [ALJ] of the Natural Resources Commission [NRC] to vacate the DNR's Notice of Violation [NOV] against Peabody. The DNR had issued the NOV against Peabody because an inspection revealed that its Hawthorn strip coal mine was in violation of certain regulations regarding the drainage of surface water off the mining site. Peabody raises two issues, which we restate as three, none of which constitute reversible error.

FACTS

The pertinent facts are not disputed: the case was submitted to the ALJ below on stipulated facts. The parties filed cross-motions for summary judgment. On July 10, 1989, a DNR mine inspector inspected Peabody's Hawthorn Mine in Sullivan County, Indiana, which is operated under a surface coal mining and reclamation operation permit issued by the DNR under the Indiana Surface Mining Act [ISMCRA]. The inspection report reads in pertinent part as follows:

[As] was mentioned in last months [sic] inspection report, additional drainage control measures are needed ... to [e]nsure

that this affected area drainage is passed thru [sic] a basin before discharging off the permit. Previously, this area was upgraded and drainage was controlled along this perimeter by the pit and by [bails of straw] at drainage focal points. Recent final grading along this perimeter however has redirected drainage so that drainage is now uncontrolled and will flow across the undisturbed area and off the permitted area without passing thru [sic] a basin. This perimeter is now characterized by an unvegetated and graded spoil slope approximately 500 ft. in length which slopes towards the wooded East perimeter. No diversion exist[s] along this perimeter and drainage can now flow Eastward off the permitted area into the ditch along side Highway 159. Evidence of off site drainage flow exist[s] along this wooded perimeter where a spoil derived sediment is deposited throughout this narrow (100 ft.) wooded strip up to and into the State Road ditch. [This NOV] is hereby issued for failure to pass all disturbed area drainage through a siltation structure before leaving the permit area and to retain all sediment within the disturbed area. The action required will call for this affected area drainage to be passed thru [sic] a sediment basin before discharging off the permit. The compliance time will be set for August 14, 1989 @ 8:00 A.M.

The NOV cited Peabody with the violation of three regulations, 310 IAC 12–5–17(a)(1), 310 IAC 12–5–20(b)(3), and 310 IAC 12–3–4; and also charged a violation of the terms of the Hawthorn Mine operating permit.[1]

---

1. 310 IAC 12–5–17(a)(1) provides:

All surface drainage from the disturbed [by mining] area shall be controlled through use of a siltation structure, a series of siltation structures, or such alternative techniques as provided in 310 IAC 12–5–20 before leaving the permit area.

310 IAC 12–5–20(b) provides:

Sediment control measures include practices carried out within and adjacent to the disturbed area. Sediment control measures consist of the utilization of proper mining and reclamation methods and sediment control practices, singly or in combination. Sediment

control methods include, but are not limited to:

\* \* \* \* \* \*

(3) retaining sediment within the disturbed areas;

310 IAC 12–3–4 provides:

Compliance with Permits. All persons shall conduct surface coal mining and reclamation operations under permits issued pursuant to the Act [IC 13–4.1] and these Regulations [310 IAC 12], and shall comply with the terms and conditions of the Act, these Regulations, and the Permit.

The Hawthorn Mine operating permit provides:

Part G.(1)(a): SURFACE WATER QUALITY

Peabody requested administrative review of the NOV. The parties agreed that the case could be resolved by summary judgment and stipulated the NOV itself and its accompanying inspection report into the record. The gravamen of Peabody's motion was that, even assuming the facts in the inspection report were true, there was insufficient evidence to support a violation because no evidence had been presented that any regulation regarding effluent limitations had been violated, nor had any evidence been presented of a disturbance in the hydrologic balance. The gravamen of the DNR's motion was that the earlier administrative rulings were erroneous and should be overruled. The ALJ, relying on the earlier administrative decisions, vacated the NOV.[2]

DNR sought judicial review in the trial court. The trial court determined that the earlier administrative rulings were erroneous and that the ALJ's decision in the present case was arbitrary, capricious, and contrary to law. This appeal ensued.

## DECISION

■ This case is:

governed by the [Indiana Administrative Orders and Procedures Act, the AOPA], IND.CODE 4–21.5–3–1 et seq. The function of the trial court on the judicial review of administrative determinations is limited to a determination of whether the agency possessed jurisdiction over the matter and whether the order was made in accordance with the proper legal procedure, was based upon substantial evidence, and did not violate any constitutional, statutory, or legal principle. The scope of judicial review of administrative determinations is limited to the consideration of whether there was substantial evidence to support the finding or order of the administrative body and whether or not the action constitutes an abuse of discretion or is arbitrary and capricious as revealed by uncontradicted facts. The burden of proving an administrative action was an abuse of discretion or arbitrary and capricious falls upon the party attempting to upset the administrative order. The Court of Appeals will not substitute its opinion for that of an agency concerning matters within the scope of that agency's discretion and authority.

Courts that review administrative determinations, at both the trial and appellate level, are prohibited from reweighing the evidence or judging the credibility of witnesses and must accept the facts as found by the administrative body. However, we need not accord the same degree of deference to an agency's conclusion on a question of law. Law is the province of the judiciary. Our constitutional system empowers the courts to draw legal conclusions and accordingly the court in its function of judicial review of an administrative action may set aside an agency determination that is not in accordance with law.

An interpretation given a statute by an administrative agency charged with the duty of enforcing the statute is entitled to great weight; however, an agency's interpretation of a statute which is incorrect is entitled to no weight. While evidence before an administrative agency will not be reweighed by the reviewing court, where the agency's finding is contrary to law, it shall be reversed. If an agency misconstrues a statute, there is no reasonable basis for the agency's ultimate action and the trial court is required to reverse the agency's action as being arbitrary and capricious.

*State Prison & State Employees' Appeals Commission v. Van Ulzen* (1991), Ind.App., 567 N.E.2d 1164, 1166–67 (Citations omitted), *vacated on other grounds,* 582 N.E.2d 789.

... The use of siltation structures and contemporaneous reclamation practices will minimize increases in suspended solids in the immediate receiving streams.
Part G.(2)(a): ... Sediment control will be provided for all disturbed area drainage in accordance with applicable regulations prior to discharge from the permit area.

**2.** The earlier administrative rulings relied upon by the present ALJ and referred to throughout this opinion are *Peabody Coal Company v. DNR,* 4 CADDNAR 58, March 18, 1988 [*Dugger* ] (Similar violations found at Peabody's Dugger Mine in Sullivan County, Indiana); and *Peabody v. DNR,* 4 CADDNAR 62, March 30, 1988 [*Universal* ] (Similar violations found at Peabody's Universal Mine in Vigo County, Indiana).

## I.

Whether the earlier administrative decisions bar the DNR from seeking judicial review of the present decision?

 Peabody argues that the earlier administrative decisions, *Dugger* and *Universal,* invoke administrative res judicata (or perhaps a collateral estoppel) upon the DNR barring it from seeking judicial review of the present order. In determining whether an administrative determination should estop a subsequent litigation, the trial court should consider 1) whether the issues sought to be estopped were within the statutory jurisdiction of the agency, 2) whether the agency was acting in a judicial capacity, 3) whether both parties had a fair opportunity to litigate the issues, and 4) whether the decisions of the administrative tribunal could be appealed to a judicial tribunal. *McClanahan v. Remington Freight Lines* (1988), Ind., 517 N.E.2d 390, 394.

Peabody's argument may have been meritorious under the law as it existed before substantial amendments in the statutory scheme governing the respective roles of the DNR and the NRC were enacted by our General Assembly in 1990 and 1991. Before 1991, a person aggrieved by an NOV issued by the DNR under ISMCRA could obtain administrative review directly from the Director of the DNR (or his appointee). IND. CODE 13–4.1–11–8 (*amended by* P.L.125–1991, Sec.34.) However, legislation in 1990 and 1991 clarified and distinguished the respective roles of the DNR and NRC. The NRC is now almost entirely a fact-finding agency; it appoints the ALJs and conducts the AOPA hearings that had previously been heard by the Director of the DNR. I.C. 14–3–3–3(e); I.C. 14–3–3–25. The AOPA requires the ALJs to be neutral fact-finders with no ties to a party agency. I.C. 4–21.5–3–11 through –13.

*Dugger* and *Universal* were adjudicated before the DNR, while the present case was adjudicated before the NRC. Thus, the ALJ sitting in the present case was not the alter ego of the Director of the DNR as was the ALJ who decided *Dugger* and *Universal.*

It would have been illogical to expect, require, or even permit the DNR to seek judicial review of the *Dugger* or *Universal* decisions as those decisions were, in effect, decisions of the Director of DNR. Thus, the earlier administrative adjudications do not estop the DNR from seeking judicial review in the present case because the DNR could not have appealed those decisions to a judicial tribunal. *McClanahan,* 517 N.E.2d 390, 394.

## II.

Whether the DNR has standing to seek judicial review of a final order rendered by an ALJ of the NRC?

 Peabody attacks the DNR's standing to seek judicial review of the ALJ's decision. Peabody cites I.C. 13–4.1–2–1(c) for the proposition that the ALJ is the "ultimate authority for the [DNR] for any administrative review proceeding ..." Peabody argues that the DNR may not seek judicial review of a decision rendered by its ultimate authority.

Peabody's proffered interpretation of I.C. 13–4.1–2–1(c), that the ALJ of the NRC is the ultimate authority or alter ego of the Director of the DNR, is, at best, specious. It is most illogical to suggest that the ultimate executive power of one agency is vested in the fact-finding ALJ appointed by another agency.

"Ultimate Authority" is a term defined by AOPA as "an individual or panel of individuals in whom the final authority of an agency is vested by law or executive order." I.C. 4–21.5–1–15. The AOPA provides further that if the ALJ is the ultimate authority for an agency, the ultimate authority's order disposing of a proceeding is a final order. I.C. 4–21.5–3–27(a). The ISMCRA provides that judicial review of a final order made by an ALJ may be taken under the AOPA. I.C. 13–4.1–2–1(e). Thus, since the ALJ of the NRC is designated as the ultimate authority of the DNR, the ALJ's disposition of a case is simply a final order ripe for judicial review, the point which represents the end of the administrative process.

The standing requirements for judicial review of a decision of an ALJ are clearly

spelled out by statute. Standing for judicial review under the AOPA is available to a person who was a party to the agency proceedings below. I.C. 4–21.5–5–3. The definition of "person" under the Act includes an agency. I.C. 4–21.5–1–11.

The DNR was a party to the administrative proceedings below. Thus, it had standing to seek judicial review of the final order entered by the ALJ which had vacated its NOV against Peabody.

### III.

Whether the trial court correctly concluded the ALJ's decision was arbitrary, capricious, and contrary to law?

Peabody argues the trial court erred in 1) failing to give appropriate deference to the ALJ's decision, 2) disregarding the *Dugger* and *Universal* decisions, and 3) relying on decisions made under the federal statutes and regulations of the Surface Mining Control and Reclamation Act of 1977 [SMCRA], 30 U.S.C. § 1201 et seq. and 30 CFR §§ 700–30 analogous to the statutes and regulations under the ISMCRA (set out in footnote 1) involved in the present case. We disagree.

Generally, the rules which apply to the construction of statutes also apply to the construction of administrative rules and regulations. *Indiana State Department of Welfare, Medicaid Division v. Stagner* (1980), Ind.App., 410 N.E.2d 1348. In construing an administrative regulation, the court must begin with the language of the regulation itself. *John Boettcher Sewer & Excavating Co., Ltd. v. Midwest Operating Engineers Welfare Fund,* (N.D.Ind.1992), 803 F.Supp. 1420. Words in an administrative regulation are to be given their plain and ordinary meaning. *Id.* In interpreting a regulation, the court must not be guided by a single sentence or a part of a sentence; the court must look to the regulation as a whole and to its object and policy. *Id.* An interpretation by an administrative agency charged with the duty of enforcing the applicable statutes and regulations is entitled to great weight; however an agency's interpretation which is erroneous is entitled to no weight. *Board of Trustees of Public Em-*

*ployees' Retirement Fund of Indiana v. Baughman* (1983), Ind.App., 450 N.E.2d 95, 96.

In *Indiana DNR v. Krantz Brothers Construction Corporation* (1991), Ind.App., 581 N.E.2d 935, we noted the following regarding the relationship between the SMCRA and the ISMCRA:

In 1977, after previous attempts in 1973 and 1975, Congress passed, and the President signed, the Surface Mining Control and Reclamation Act (SMCRA) [30 U.S.C. § 1201 et seq.]. SMCRA is designed to provide a uniform nationwide program for the reclamation of land affected by surface coal mining operations. 30 U.S.C.A. § 1202. Uniformity is to be achieved, however, not through direct United States Department of the Interior control of surface mining across the nation, but rather through Interior Department oversight authority over state programs which must be at least as stringent as the federal program. 30 U.S.C.A. §§ 1253, 1271(d). If a state fails to develop a program, or fails to develop an acceptable program after the Secretary of the Interior has rejected a proposed program, the state will not obtain permanent regulatory authority, and a federal plan will be imposed. 30 U.S.C.A. § 1254; *Hodel v. Indiana* (1981), 452 U.S. 314, 319–20, 101 S.Ct. 2376, 2380–81, 69 L.Ed.2d 40. Once a state has obtained permanent regulatory authority, it must labor diligently to enforce its approved program vigorously, or the Interior Department will take over enforcement duties. 30 U.S.C.A. §§ 1254(b), 1271(b). Indiana achieved permanent regulatory authority, known as 'primacy,' on July 29, 1982. *See* C.F.R. § 914.10 (1991).

* * * * * *

[Indiana's act, the ISMCRA] is largely a copy of the SMCRA.... In enacting the [ISMCRA], our General Assembly made clear its unequivocal intent to avoid federal control of Indiana surface coal mining and land reclamation. *See* Ind.Code 13–4.1–1–1(4); 13–4.1–1–2(1). Indeed, the first purpose of the [ISMCRA] is to implement and enforce SMCRA. *Id.* Therefore, because our first goal in construing a statute is to give effect to the intent of the legislature, [citation omitted], we will look to SMCRA

and the federal rules adopted under it as we analyze the [ISMCRA].

581 N.E.2d at 937. With regard to the SMCRA and the regulations promulgated by the Secretary of the Interior under the SMCRA, the state laws and regulations must be no less stringent than, meet the minimum requirements of, include all applicable provisions of, and be no less effective than the SMCRA. 30 CFR § 730.5(a) & (b).[3]

The Interior Board of Land Appeals [IBLA] has analyzed the federal regulations promulgated under the SMCRA which are analogous to the regulations promulgated under the ISMCRA at issue in the present case. *Turner Brothers, Inc. v. Office of Surface Mining*, (1988), 102 IBLA 299. In *Turner*, the appellate tribunal held that the sedimentation pond requirement is a preventative measure and proof of actual harm to the environment was not required to establish a violation. *Id.* In *C & N Coal Co., Inc. v. Office of Surface Mining*, (1988), 103 IBLA 48, the IBLA again upheld a violation of the regulations pertaining to surface water drainage in which no evidence of an effluent violation had been presented, holding:

> In order to prove a violation of 30 CFR 715.17(a), [the Interior's Office of Surface Mining Reclamation and Enforcement, OSMRE] must establish that there was a failure to pass surface drainage from the disturbed area through a sedimentation pond or series of sedimentation ponds *before leaving* the permit area. It is not necessary that OSMRE establish the occurrence of any environmental damages.

103 IBLA at 56 (Citations omitted; emphasis original).

▉ In the present case, in issuing the NOV against Peabody regarding its Hawthorn mine, the DNR found that surface water was leaving the permit area without first passing through a siltation structure or basin. These facts were stipulated as true for the purposes of these proceedings. The ALJ below, as well as the one involved in the *Dugger* and *Universal* cases, found that the DNR had failed to establish a violation of the regulations regarding surface water drainage because no evidence had been presented that (other) regulations regarding effluent standards had been violated and no evidence had been presented that the hydrologic balance had been disturbed.

The ISMCRA regulations involved in this case (as set out in footnote 1) unequivocally require that surface water pass through a sedimentary structure before leaving the area disturbed by strip mining. There is no basis to be found in the language of these regulations to support the additional evidentiary requirements imposed by the ALJ below and in the *Dugger* and *Universal* cases. The federal regulations and administrative decisions expressly denounce such an additional evidentiary requirement to prove a surface water drainage violation.

The DNR brief indicates that an Indiana citizen has recently petitioned the Department of the Interior to revoke Indiana's primacy status in the regulation of its strip mines. Regulations under the ISMCRA must be at least as stringent as their federal counterparts. 30 CFR § 730.5(a) & (b). In order to retain primacy and ward off the imposition of federal control in this area, Indiana must labor diligently to enforce the ISMCRA. *Krantz Brothers*, 581 N.E.2d 935, 937; 30 U.S.C. §§ 1254(b), 1271(b).

The facts as stipulated in the NOV and the investigative report plainly establish a violation of the regulations as charged and a violation of the terms of Peabody's operating permit. As there was no basis for the vacation of the NOV, the trial court correctly concluded that the action by the ALJ was arbitrary, capricious, and contrary to law.

Judgment affirmed.

NAJAM and MILLER, JJ., concur.

---

3. The federal regulations which parallel the ISMCRA regulations involved in the present case (set out in footnote 1) read as follows:

> All surface drainage from the disturbed area ... shall be passed through a sedimentation pond or series of sedimentation ponds ... [before] leaving the permit area. 30 CFR §§ 715.-17(a) & 717.17(a).
> All surface drainage from the disturbed area shall be passed through a siltation structure before leaving the permit area, ... 30 CFR §§ 816.46(b)(2) & 817.46(b)(2).