Indiana **DEPARTMENT OF NATURAL RESOURCES**, Appellant,

v.

**PEABODY COAL COMPANY,**
Appellee.

No. 77A04–9909–CV–429.

Court of Appeals of Indiana.

Nov. 16, 2000.

Jeffrey A. Modisett, Daniel B. Dovenbarger, Attorney General's Office, Indianapolis, Indiana, Attorneys for Appellant.

G. Daniel Kelley, Jr., Dana G. Meier, Ice Miller, Indianapolis, Indiana, Attorneys for Appellee.

## OPINION

SHARPNACK, Chief Judge

The Indiana Department of Natural Resources ("DNR") appeals the judgment of the trial court affirming a decision of the administrative law judge ("ALJ") in favor of Peabody Coal Company ("Peabody"). The DNR raises four issues, which we consolidate and restate as:

(1) whether the trial court erred in affirming the ALJ's decision that the DNR had applied an incorrect legal standard in requiring Peabody to replace more than topsoil for land reclamation; and

(2) whether the trial court erred in affirming the ALJ's decision that the DNR made inadequate findings to support its determination that Peabody was required to remove eighteen inches of soil, including both topsoil and subsoil, for land reclamation.

We affirm.

The relevant facts follow. The DNR is a state administrative agency with responsibility for the administration and enforcement of the Indiana Surface Mining Control and Reclamation Act ("SMCRA"),[1] a program for the regulation of surface coal mining. Peabody is a corporation that operates surface coal mining operations under SMCRA permits issued by the DNR. This case arises out of the refusal of the DNR to allow a revision to four of Peabody's surface mining permits so as to allow Peabody to remove and store for replacement eight to twelve inches of topsoil rather than eighteen inches of combined topsoil and subsoil as the permit required.

In 1990, it was the DNR's policy to require surface land miners to replace and redistribute a minimum of eighteen inches of soil, which could include both topsoil and subsoil, after mining on all non-prime farmland areas used as cropland. On October 12, 1990, Peabody filed a request for administrative review, under 310 Ind.Administrative Code 0.6–1–15, seeking to set aside the DNR's policy.[2] The ALJ determined that the most reasonable interpretation of 310 Ind.Administrative Code 12–5–12.1, the section of the SMCRA that bears most directly on topsoil and subsoil replacement for surface coal mining activities, was that subsoil is not generally required to be salvaged and replaced. However, under subsection (f), which acts as an exception to the general principle, the DNR could require subsoil to be salvaged and replaced only if the director found subsoil replacement to be necessary in a particular case. The ALJ concluded that without having formally promulgated a rule in accordance with Ind.Code § 4–22–2, the DNR could not uniformly require all miners to replace a minimum of eighteen inches of soil after mining regardless of whether eighteen inches of topsoil existed before mining.

While that case was pending review by the trial court, the DNR and Peabody agreed as to the permits at issue here to a condition requiring a soil replacement

---

1. Ind.Code §§ 14–34–1–1 to 14–34–19–14.

2. 310 IAC 0.6–1–15 provides, in pertinent part:

"A person may, in writing, request the department to interpret a statute or rule administered by the department as applicable to a specific factual circumstance."

depth of eighteen inches, subject to judicial review by the trial court. Pursuant to the agreement, Peabody thereafter submitted permit revisions incorporating the eighteen inch minimum soil replacement depth with a reservation that if the eighteen inch policy was determined to be invalid by the trial court, it would submit another revision to seek removal of the language.

When the trial court affirmed the decision of the ALJ that the DNR could not impose a general minimum soil replacement depth of eighteen inches for all cropland without having formally promulgated such a rule,[3] Peabody sought a revision to the permits at issue here to reduce the amount of soil it had to replace after mining. In essence, Peabody sought to remove and replace only the topsoil, which varied from eight to twelve inches, not the subsoil. After reviewing Peabody's revision applications, the DNR denied the applications in four separate, but virtually identical letters. In each of the four letters, the DNR wrote:

> The applicant proposes to restore an average of 8 to 12 inches of topsoil on graded cast overburden for all non-prime farmland areas. Based upon the information available to the Director, the Director finds in this specific case, a soil replacement of 8 to 12 inches is inadequate to comply with the land capability restoration and revegetation requirements of 310 IAC 12–5. Therefore, the Director has made a special finding that it is appropriate with respect to this particular case to require a portion of the subsoil be removed and segregated, and redistributed in accordance with 310 IAC 12–5–12.1 since he finds such subsoil layers are necessary to comply with the land capability restoration and revegetation requirements of 310 IAC 12–5.

Record, pp. 903, 905, 913, 917.

Peabody petitioned for administrative review of the DNR's denial of its requests

to reduce soil replacement depths. On April 14, 1998, the ALJ made the following findings, in pertinent part:

> (15) As specified in IC 14–34–10–2(b)(3), one of the duties of an operator is to '[r]estore the land affected to a condition capable of supporting the uses that the land was capable of supporting before mining or higher or better uses.'

> (16) The clear statutory purpose of Indiana SMCRA is to require an operator to reclaim land to as 'good or better shape as it was prior to mining.' *JH & L Coal Company, d/b/a Miller Mining v. Department of Natural Resources,* 7 Caddnar 28 (1994). To that end, unless a site is restored to the same use as existed prior to mining, the site must be restored to a higher and better use. A corollary is that the approved postmining land use for a particular site is either the same as, or better than, the premining land use.

> (17) The 'special finding' made by the DNR for the subject permits requires a two-prong standard be met in order for an operator not to provide 18 inches as a standard soil replacement. Reference is made both to 'land capability restoration' and to 'revegetation' requirements.

> (18) ... compliance with the revegetation requirements for the approved postmining land use is a cornerstone of Indiana SMCRA. Since the approved postmining land use is either the same as or better than the premining land use, compliance with the revegetation requirements assures an operator must reclaim the land to as good as or a better condition than existed prior to mining.

> (19) In the *Peabody* cases, the approved postmining land use is cropland. Revegetation requirements must be measured within the context of cropland....

> (20) No general 'land capability' standard is set forth in 310 IAC 12–5–12.1(f), however, apart from the revegetation

---

**3.** No further appeal of this issue was taken.

requirements in 310 IAC 12–5–59, 61, 62, 63, and 64.1. Soil replacement, land use, and revegetation are inextricable. Attainment of the approved postmining land use, as demonstrated by compliance with the revegetation requirements for that land use, insure that the land will be restored to a condition capable of supporting that use. 310 IAC 12–5–68 requires an operator reclaim either to the land use which existed prior to mining or to another approved 'higher and better use.' Section 68 does not require an operator to establish 'land capability' of the approved postmining land use, as well as a variety of other land uses. The 'land capability' of the two-prong test sought to be established by the DNR in the 'special finding' is not supported by Indiana SMCRA.

(21) The documentation listed by the DNR in support of each 'special finding' is general and pervasive. Soil types are listed. Literature is listed. Nowhere does the DNR provide findings which are derived from specific postmining land uses. The broad sweep of these 'special findings' precludes administrative review. The broad sweep of these 'special findings' does not comport with the narrow, precise strokes anticipated by the regulatory structure and embodied most directly by 310 IAC 12–5–12.1(f).

(21) [sic] The DNR has the burden of going forward to show under 310 IAC 12–5–12.1(f) that the land to be reclaimed under the subject permits embodies those 'limited circumstances' where additional soils from subsoil layers are needed to comply with the revegetation requirements of 310 IAC 12–5 for the approved postmining land use. The documentation in the record fails to meet the burden because it fails to provide the site specificity anticipated by 310 IAC 12–5–12 .1(f). The documentation in the record also fails to meet the burden because it applies a standard not set forth in 310 IAC 12–5–59, 61, 62, 63 or 64.1 for approved postmining land uses. The DNR's 'special finding' exemplified by Permit S–246 is a template which could be applied to all non-prime farmland, resulting in universal application of the 18–inch soil replacement minimums. Public policy may support a universal 18 inch soil replacement minimum, but if so, it is a public policy properly embodied by rule or statute.

Record, pp. 980–981. The ALJ's final order is as follows:

Each of the permits at issue … is remanded to the [DNR] so that it may determine whether portions of the subsoil should be removed and segregated, stockpiled and redistributed as subsoil in accordance with 310 IAC 12–5–12.1(d) and (e), where the portions are necessary to comply with the revegetation requirements of 310 IAC 12–5–59, 310 IAC 12–5–61, 310 IAC 12–5–62, 310 IAC 12–5–63, and 310 IAC 12–5–64.1. Any determination must be site specific and must include soil analysis by a qualified professional which demonstrates that soil replacement, in addition to existing topsoil, is needed to achieve the revegetation requirements of the approved postmining land use.

Record, p. 982.

The DNR appealed the decision of the ALJ, contending that the ALJ had erroneously placed the burden on the DNR to show that additional soils from subsoil layers were necessary and erroneously determined that the DNR's findings were insufficient to support its determination that Peabody needed to replace eighteen inches of topsoil in order to reclaim the land. On review, the trial court affirmed the ALJ's findings and conclusions.

■ The Indiana Administrative Orders and Procedures Act governs this case. *See* Ind.Code §§ 4–21.5–1–1 to 4–21.5–6–7. Upon judicial review of an agency order, a trial court is limited to determining whether the agency's action is:

(1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(2) contrary to constitutional right, power, privilege, or immunity;

(3) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(4) without observance of procedure required by law; or

(5) unsupported by substantial evidence.

I.C. § 4–21.5–5–14(d). The burden of demonstrating the invalidity of the agency action is on the party who is asserting the invalidity. *Peabody Coal Co. v. Indiana Dep't of Natural Res.*, 629 N.E.2d 925, 928 (Ind.Ct.App.1994), *summarily aff'd,* 664 N.E.2d 1171, (*quoting State Prison & State Employees' Appeals Comm'n v. Van Ulzen,* 567 N.E.2d 1164, 1166–1167 (Ind. Ct.App.1991), *vacated on other grounds,* 582 N.E.2d 789).

Neither a trial nor an appellate court reviewing an administrative determination may reweigh the evidence or judge the credibility of witnesses. *Id.* Both must accept the facts as found by the administrative body. *Id.* However, because law is the province of the judiciary, we need not accord the same degree of deference to an agency's conclusion on a question of law. *Id.* Thus, " '[a]n interpretation given a statute by an administrative agency charged with the duty of enforcing the statute is entitled to great weight; however, an agency's interpretation of a statute which is incorrect is entitled to no weight.' " *Id.* While the reviewing court may not reweigh the evidence that was before the administrative agency, it may reverse the agency's finding if it is contrary to law. *Id.* Similarly, if an agency misconstrues a statute and there is no reasonable basis for the agency's ultimate action, the agency's action may be reversed on review as being arbitrary and capricious. *Id.*

Generally, the rules that apply to the construction of statutes also apply to the construction of administrative rules and regulations. *Id.* at 930. In construing an administrative regulation, words must be given their plain and ordinary meaning. *Id.* The court must look to the regulation as a whole and to its object and policy rather than placing emphasis on a single sentence or a part thereof. *Id.* As with statutes, "[a]n interpretation by an administrative agency charged with the duty of enforcing the applicable statutes and regulations is entitled to great weight; however an agency's interpretation which is erroneous is entitled to no weight." *Id.*

### I.

The first issue is whether the trial court erred in affirming the ALJ's decision that the DNR had applied an incorrect legal standard in requiring Peabody to replace more than topsoil for land reclamation. The DNR's denial of Peabody's request to reduce soil replacement depths was premised on the DNR's assertion that replacement of only eight to twelve inches of topsoil was "inadequate to comply with the land capability restoration *and* revegetation requirements of 310 IAC 12–5." Record, pp. 903, 905, 913, 917 (emphasis added). The ALJ found that the "land capability" prong of the DNR's two-part test was not supported by the SMCRA.

Under the SMCRA, miners are required to remove the topsoil as a separate layer before mining, segregate it, and then replace the topsoil after mining as part of the reclamation process. Ind.Code § 14–34–10–2; 310 IAC 12–5–12.1(a). On this point, the parties agree. However, the parties disagree about when miners are required to remove, segregate, and redistribute the subsoil.

The DNR contends that soil replacement depths (and, thus, whether subsoil removal and replacement of the subsoil are required) are dependent upon both the revegetation requirements of 310 IAC 12–5 *and* the land capability restoration re-

quirements of 310 Ind.Administrative Code 12–5–68. Peabody, on the other hand, contends that because the revegetation requirements of 310 IAC 12–5 assures that a miner reclaims the land to as good or better condition than existed prior to mining, it is the controlling regulation with respect to the question of when the removal and replacement of subsoil is required.

310 IAC 12–5–68(a), the regulation cited by the DNR in support of its land capability restoration requirement, provides that "[a]ll affected areas shall be restored in a timely manner. (1) To conditions that are capable of supporting the uses which they were capable of supporting before mining; or (2) To higher or better uses . . . ." 310 IAC 12–5–68(a). Thus, the approved post-mining land use must be either the same as, or better than, the pre-mining land use. This rule does not, however, mention subsoil replacement.

The rule that deals most directly with the issue of subsoil replacement in surface coal mining operations is 310 IAC 12–5–12.1.[4] That rule provides, in pertinent part:

(a) Removal. All topsoil shall be removed as a separate layer from the area to be disturbed, and segregated.

\* \* \* \* \*

(2) If the topsoil is less than six inches (6″) thick, the permittee may remove the topsoil and the unconsolidated materials immediately below the topsoil to a total depth of six inches (6″) and treat the mixture as topsoil.

\* \* \* \* \*

(f) Subsoil Segregation. The director may require that portions of the subsoil be removed and segregated, stockpiled and redistributed as subsoil in accor-

dance with the requirements of paragraphs (d) and (e) of this rule if he finds such subsoil layers are necessary to comply with the revegetation requirements of 310 IAC 12–5.

310 IAC 12–5–12.1(f). As held by the ALJ and affirmed by the trial court, the plain language of 310 IAC 12–5–12.1(f) indicates that a miner is not required to remove and replace subsoil unless the director of the DNR finds such is necessary to meet the revegetation requirements.

■ The DNR, citing to 310 IAC 12–5–68, argues that this interpretation of the rule is erroneous because the SMCRA clearly requires that a miner return the land to its pre-mining capability. We agree that the mined land must be returned to a condition that is at least as good as existed prior to mining. However, the revegetation requirements found in 310 IAC 12–5 are specifically directed to the approved post-mining land uses and are the method by which the goal set forth in 310 IAC 12–5–68 of returning the land to its premining condition is reached. For example, 310 Ind.Administrative Code 12–5–59(a) provides, "Each person who conducts surface mining activities shall establish . . . a diverse, effective, and permanent vegetative cover of the same seasonal variety native to the area that supports the approved postmining land use." 310 IAC 12–5–59(a). Subsection (b) of that rule provides that "[a]ll revegetation shall be carried out in a manner . . . compatible with the approved postmining land use . . . ." 310 IAC 12–5–59(b). 310 Ind.Administrative Code 12–5–62 prescribes mulching and other soil stabilization practices that will provide adequate soil erosion control to be replaced by perennial species "approved by the postmining land use." 310 IAC 12–5–62. Moreover, 310 Ind.Administrative Code 12–5–

4. The approved post-mining land use in the instant case is cropland, which is distinctly different from prime farmland. *See* 310 IAC 12–.05–32; 12–.05–92. Thus, the more stringent standards applicable to prime farmland are not at issue in this case, and this opinion is not to be construed as commenting on subsoil replacement levels with respect to prime farmland. *See, e.g.,* 310 IAC 12–5–146; 12–5–148.

64.1 identifies how success is measured for revegetation with respect to approved postmining land uses. *See* 310 IAC 12–5–64.1. Therefore, we agree with the trial court that the ALJ's "conclusion that attainment of the approved postmining land use, as demonstrated by compliance with the revegetation requirements for that land use, insures [sic] that the land will be restored to a condition capable of supporting that use is correct and is a reasonable interpretation of the regulations . . . ." Record, p. 1130; *see, e.g., Peabody,* 629 N.E.2d at 930. Thus, the appropriate standard in determining whether subsoil must be removed and replaced is 310 IAC 12–5–12.1.

The DNR further argues that the ALJ read 310 IAC 12–5–12.1(f) in isolation from the rest of the statutes and regulations, and that in doing so the ALJ mistakenly placed the burden of proof in denying the permit revision on the DNR. Specifically, the DNR contends that pursuant to Ind. Code § 14–34–4–7(a), the burden is on the applicant, (here, Peabody) not the DNR, to demonstrate that the proposed revisions comply with the requirements of SMCRA. That statute provides, in pertinent part:

> The applicant has the burden of establishing that the application complies with all the requirements of this article. The director may not approve a permit or revision application unless the application affirmatively demonstrates and the director finds the following:

> \* \* \* \* \*

> (5) The applicant has demonstrated that reclamation as required by this article can be accomplished under the reclamation plan contained in the permit application.

Ind.Code § 14–34–4–7(a)(2).

We agree that a mining applicant generally bears the burden of proving that the proposed revision complies with the requirements of SMCRA. However, we note that the ALJ did not shift the burden of proof in denying the permit revision to the DNR: the ALJ merely remanded the permits to the DNR so it could make appropriate findings regarding whether Peabody was required to remove portions of the subsoil to comply with the revegetation requirements. Moreover, as previously discussed, compliance with the revegetation requirements assures that a miner reclaims the land to as good or better condition than existed prior to mining. Therefore, by requiring that Peabody meet both the revegetation standards and the land capability restoration requirement, the DNR used an erroneous legal standard in requiring the removal of more than topsoil. Peabody cannot be required to demonstrate compliance with the DNR's erroneous standard.

As set forth in 310 IAC 12–5–12.1(f), Peabody's proposal for removal and replacement of topsoil only is in compliance with the regulation unless the DNR finds that portions of the subsoil need to be removed to comply with the revegetation requirements. The DNR's position that Peabody has the burden of persuading it that portions of the subsoil do not need to be removed and replaced ignores the plain language of the regulation, which provides that the director of the DNR "may require that portions of the subsoil be removed and . . . redistributed . . . *if he finds* such subsoil layers are necessary to comply with the revegetation requirements of 310 IAC 12–5." 310 IAC 12–5–12.5(f) (emphasis added).

Therefore, we hold that the trial court correctly affirmed the ALJ's decision that the DNR had applied an incorrect legal standard in requiring Peabody to replace more than topsoil for land reclamation. *See, e.g., Peabody,* 629 N.E.2d at 930.

### II.

The second issue is whether the trial court erred in affirming the ALJ's decision that the DNR had made inadequate findings to support its determination that Peabody was required to remove eighteen inches of soil, including both topsoil

and subsoil, for land reclamation. The DNR made special findings in support of its permit revision denials. However, its findings "indicated that Peabody's proposals could not restore the mined areas to their pre-mining land use capabilities...." Appellant's Brief, p. 10. Because the findings are not geared toward whether replacement of topsoil only would comply with the revegetation requirements of 310 IAC 12–5, they are necessarily inadequate. Moreover, the ALJ's determination that the DNR's findings were inadequate to support the permit revision denial is entitled to substantial deference. *See, Peabody Coal Co. v. Indiana Dep't of Natural Res.*, 606 N.E.2d 1306, 1310 (Ind.Ct.App. 1992). We are not prepared to substitute our judgment for the ALJ and affirm the determination of the trial court upholding the decision of the ALJ. As a consequence, this matter is referred back to the DNR for further proceedings consistent herewith.

For the foregoing reasons, we affirm the judgment of the trial court.

Affirmed.

BAKER, J., and ROBB, J., concur.