[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
NOV 22 2000
THOMAS K. KAHN
CLERK

_____

No. 99-11917

_____

O.S.H.R.C.  No. 98-00823

J.A.M. BUILDERS, INC.,

Petitioner,

versus

ALEXIS HERMAN, Secretary of Labor, and
OCCUPATIONAL SAFETY AND HEALTH REVIEW COMMISSION,

Respondents.

_____

Petition for Review of an Order of the Occupational Safety and
Health Review Commission
_____

**(November 22, 2000)**

Before CARNES and BARKETT, Circuit Judges, and POLLAK*, District Judge.

_____
*Honorable Louis H. Pollak, U.S. District Judge for the Eastern District of Pennsylvania, sitting
by designation.

BARKETT, Circuit Judge:

J.A.M. Builders, Inc., ("J.A.M.") petitions for review of a final decision of the Occupational Safety and Health Review Commission (the "Commission") affirming the administrative law judge's ("ALJ") finding that it willfully violated a safety regulation promulgated pursuant to the Occupational Safety and Health Act ("OSHA").

J.A.M. was a subcontractor at a construction site in Miami Beach, Florida, where an ironworker was killed by electrocution. After an investigation into the fatality, the Secretary of the Department of Labor (the "Secretary") issued a citation and notice of a proposed penalty against J.A.M., alleging various violations of OSHA safety standards. One of the charges alleged that J.A.M. willfully violated a construction industry safety standard that prohibits an employer from permitting its employees to work in such proximity to electrical power circuits that they could come into contact with them, without taking adequate precautions to protect employees from the risk of electric shock.

On appeal, J.A.M. challenges the Commission's decision that it willfully violated this standard, arguing that the Commission's decision is not supported by substantial evidence and is not in accordance with the law. We review the Commission's findings of fact to determine whether they are supported by substantial evidence on the record as a whole; if so, they are deemed conclusive.

See 29 U.S.C. § 660(a); Niemand Indus., Inc. v. Reich, 73 F.3d 1083, 1084 (11th Cir. 1996). "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997). We also review whether the Commission's order is "in accordance with the law." Reich v. Trinity Indus., Inc., 16 F.3d 1149, 1152 (11th Cir. 1994).

The safety standard at issue, 29 C.F.R. § 1926.416(a)(1), provides:

> No employer shall permit an employee to work in such proximity to any part of an electric power circuit that the employee could contact the electric power circuit in the course of work, unless the employee is protected against electric shock by de-energizing the circuit and grounding it or by guarding it effectively by insulation or other means.

OSHA differentiates among violations of varying severity. J.A.M was charged with the most severe offense, to wit, a "willful" violation pursuant to 29 U.S.C. § 666(a), which is subject to the greatest penalties under the Act: a fine not less than $5,000 and up to $70,000, and the possibility of imprisonment if the willful violation causes an employee's death. See 29 U.S.C. § 666(a), (e). See also United States v. Ladish Malting Co., 135 F.3d 484, 490 (7th Cir. 1998) (differentiating various offenses under 29 U.S.C. § 666).

The ALJ upheld the citation, finding that J.A.M. failed to adequately protect its employees working in proximity to energized electrical lines on November 5th

3

through the 7th.  The administrative record upon which the ALJ based his decision reflects the following.  J.A.M. Builders was hired by Brodson Construction Company, the general contractor, to construct the shell of a three-story building. The new structure, measuring 85 feet long by 17 feet wide, was an addition to an existing building.  At the time of the fatality, the structure stood approximately 20 feet tall.[1]  During the relevant time period, three energized, high-voltage electrical lines, or primary conductors, carrying 7,620 volts of electricity each, ran parallel to the building's east side approximately 8-12 feet above the structure.  These lines were not insulated and were held up by one pole located at the northeast corner of the building, 19 inches away from the east wall, and by another pole at the southeast corner.

After J.A.M. began its work on the building, company employees orally informed Brodson that the high-voltage lines needed to be rerouted.  Five days before J.A.M. began working with steel on the third floor, J.A.M.'s project manager additionally wrote Brodson that a Florida Power & Light Co. ("FP&L") representative had instructed J.A.M. that work would not be allowed to continue in proximity to the lines unless they were moved, and requested Brodson to

---

[1]  The structure was located on a corner lot: the south side abutted the existing building, the west side abutted another building, the east side faced an alley (across from which were several buildings), and the north side faced the street.

"coordinate with [FP&L] to have these lines moved." Before the ALJ, J.A.M. took the position that notwithstanding its letter to Brodson, J.A.M. had fabricated this story in order to shift blame to FP&L for any project delays.[2] However, Canute Lobean, a compliance officer for the Secretary, and John Jacob, an FP&L claims agent, testified that the FP&L representative, Diego Borges, told them that he had warned J.A.M. about working in proximity to the energized lines.

On November 5, 1997, when J.A.M. began working with steel on the third floor, the energized lines along the building's east side had not been de-energized, rerouted, moved, or insulated. Nonetheless, ironworkers working for J.A.M. began hoisting narrow bars of reinforcing steel ("rebar"), measuring between 16-20 feet long, from the ground level to the third floor, passing it through a second-floor window and then through a four-foot by four-foot hole located between the second and the third floors. The rebar was passed up length-wise, and was angled at a forty-five degree angle opposite from the building's east wall and away from the energized lines, although it was tall enough that it could have touched the energized lines had it been stood up and/or leaned toward the east wall. After the rebar was lifted through the hole in the third floor, it was tied together on a 16-inch

---

[2]  The Secretary's compliance officer also testified that J.A.M.'s president, John Bullis, admitted that there were safety hazards at the construction site, but that it was Brodson's responsibility, not J.A.M.'s, to contact FP&L to have the lines rerouted.

cinderblock, supported by a 4-inch piece of wood, to form an interlocking matting of steel, which was then placed over a wood frame to form the base of the floor, or deck, into which concrete would be poured. Rebar was also used by J.A.M. to build the frame for horizontal and vertical support beams on the third floor. The hole was closed on November 5 after J.A.M. thought it had finished its ironwork.

On November 6, 1997, J.A.M. discovered that it needed more rebar and began raising rebar to the third floor along the outside of the east wall. Under the direction of Juan Carlos Diaz, J.A.M.'s foreman, the ironworkers passed rebar length-wise directly from the ground level to the third floor, sometimes with the assistance of a worker positioned at the second-floor window. However, all work was stopped later that day by James Stowe, the ironworkers' union foreman, after he was informed by an electrician of the severe danger of working along the east wall close to the energized lines.

After Stowe stopped the work, J.A.M. management officials and representatives for the ironworkers met. The J.A.M. officials testified that at this meeting the parties agreed that the remaining rebar would be passed to the third floor along the north wall, instead of the east wall above which the energized lines were located. The ironworkers who attended the meeting testified that J.A.M. had agreed to cut a new hole in the floor, so that the rebar could be passed through as it

6

had been on November 5. It is undisputed that a new hole was not cut into the floor.

The next day, November 7, the ironworkers' union substituted Larry Williams as foreman for Stowe, whom J.A.M. had fired.[3] Williams was instructed by J.A.M. to pass the remaining rebar along the structure's north side. Notwithstanding these instructions, Williams and several ironworkers passed rebar along the east side. Williams was standing on the third floor deck and was receiving rebar from below when a 16-foot, 9-inch long piece of rebar he was holding came into contact with one of the high-voltage lines. Williams was electrocuted and died. Foreman Diaz testified that he was on site in J.A.M.'s office when the accident occurred. Ironworker Miguel Doreus testified that Diaz was at the site that day and that Diaz saw them working along the structure's east side.

Based on evidence presented that J.A.M. knew of the hazard involved both before work began and during construction of the structure's third floor, the ALJ

---

[3] The testimony reflects that J.A.M. felt that Stowe should not have stopped work on the 6th and attributed the work stoppage to "personality conflicts" between Stowe and J.A.M.'s foreman. Stowe testified that, after he ordered the work stoppage, J.A.M.'s foreman told him that "[he] had better look for [] a new job because [he] no longer [had] one." Stowe testified that he was allowed to finish work that day, but that he was not to report to the jobsite on November 7. The union representative, David Gornewicz, and J.A.M.'s vice president, Bill Mack, also testified that J.A.M and the ironworkers agreed that Stowe would be replaced by another foreman on November 7.

found that J.A.M. had a "heightened awareness of the hazardous conditions," and concluded that its violation over the three days was "willful." The ALJ rejected J.A.M.'s affirmative defense that Williams had committed employee misconduct, reasoning that J.A.M. had not established work rules designed to prevent the violation and had no written safety program. The ALJ observed:

> The deck was only 17 feet wide. The rebar was up to 20 feet long. The high voltage lines were 10 feet above the deck. . . . Walls of adjacent buildings abutted the west and south sides of the deck. Rebar lifted to the deck would, of necessity, come close to the energized lines. [J.A.M.] knew this long before the period of November 5, 1997, through November 7, 1997. It took no action to eliminate the hazard or guard the energized lines. It continued to allow its employees to work in close proximity to this hazardous condition throughout this three-day period until one employee finally contacted the high voltage lines with rebar in the course of his work. . . .
>
> Allowing employees to continue to work from November 5, 1997, through November 7, 1997, with [a] heightened awareness [of the hazardous conditions] clearly indicates [J.A.M.'s] conscious disregard for the requirements of the Act and plain indifference to the safety of its employees. . . .

The ALJ assessed a $35,000 civil penalty for this violation. Because the Commission declined J.A.M.'s request to review the ALJ's decision, the ALJ's decision became the Commission's final order. See 29 U.S.C. § 661(j).

## DISCUSSION

J.A.M. preliminarily contends that the ALJ erred by admitting the out-of-court statement of FP&L representative Diego Borges, that he had previously

8

warned J.A.M. not to work in proximity to the energized lines running along the structure's east side. "Hearsay is admissible in administrative hearings and may constitute substantial evidence if found reliable and credible." Williams v. U.S. Dep't of Transp., 781 F.2d 1573, 1578 n.7 (11th Cir. 1986). We have identified several factors that demonstrate hearsay's probative value and reliability for purposes of its admissibility in an administrative proceeding: whether (1) the out-of-court declarant was not biased and had no interest in the result of the case; (2) the opposing party could have obtained the information contained in the hearsay before the hearing and could have subpoenaed the declarant; (3) the information was not inconsistent on its face; and (4) the information has been recognized by courts as inherently reliable. See U.S. Pipe & Foundry Co. v. Webb, 595 F.2d 264, 270 (5th Cir. 1979)[4] (citing Richardson v. Perales, 402 U.S. 389, 402-06, 91 S.Ct. 1420, 1428-30, 28 L.Ed.2d 842 (1971)).

Borges' statement was recounted by Canute Lobean, the compliance officer, and John Jacob, the FP&L claims agent who was not affiliated or employed by a party to this case. Borges' statement was not inconsistent on its face and was consistent with other evidence presented, including J.A.M.'s own letter to Brodson

---

[4] This Court has adopted as binding precedent all Fifth Circuit decisions handed down prior to the close of business on September 30, 1981. See Bonner v. Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

requesting that it contact FP&L to move the energized lines before J.A.M. began using steel on the third floor. Because Borges' out-of-court statement was sufficiently reliable, we conclude that the ALJ did not err by admitting it into evidence.

J.A.M. next argues that substantial evidence does not support the Commission's finding that its violation was "willful" because, on each of the three days in question, it used methods designed to adequately protect the ironworkers from coming into contact with the energized lines.

Although the term "willful" is not defined in the Act, this Court has held that in its simplest form, a willful violation is "an intentional disregard of, or plain indifference to, OSHA requirements." Reich v. Trinity Industries, Inc., 16 F.3d 1149, 1152 (11th Cir. 1994) (quoting Georgia Elec. Co. v. Marshall, 595 F.2d 309, 318 (5th Cir. 1979)). The Court in Trinity reiterated the former Fifth Circuit's adoption of the Commission's determination that a violation is "willful" if an employer commits an act in either "intentional disregard of, or plain indifference to, OSHA requirements." Trinity Indus., 16 F.3d at 1152 (quoting Georgia Elec. Co., 595 F.2d at 318). Under the Commission's definition, to be deemed "willful," proof must be adduced either that (1) "[the] employer knew of an applicable standard or provision prohibiting the conduct or condition and consciously

disregarded the standard," or (2) that, if the employer did not know of an applicable standard or provision's requirements, it exhibited such "reckless disregard for employee safety or the requirements of the law generally that one can infer that . . . the employer would not have cared that the conduct or conditions violated [the standard]." Secretary of Labor v. Williams Enter., Inc., 13 O.S.H. Cas. 1249, 1257 (BNA) (O.S.H.R.C. 1987). See also Trinity Indus., 16 F.3d at 1152-55 (holding that employer committed willful violation because it knew of the standard but decided not to comply, despite employer's good faith belief that its own approach provided protection at least equivalent to OSHA's requirements); Valdak Corp. v. Occupational Safety & Health Review Comm'n, 73 F.3d 1466, 1469 (8th Cir. 1996) (holding that an employer who "substitutes his own judgment for the requirement of a standard or fails to correct a known hazard commits a willful violation even if the employer does so in good faith"); Brock v. Morello Bros. Constr., Inc., 809 F.2d 161, 164-66 (1st Cir. 1987) (holding that "an act may be willful if the offender shows indifference to the [law]; he need not be consciously aware that the conduct is forbidden . . ., but his state of mind must be such that, if he were informed of the rule, he would not care"). Cf. McLaughlin v. Union Oil Co. of California, 869 F.2d 1039, 1047 (7th Cir. 1989) (setting aside

11

willful violation because no evidence was presented that employer was "reckless," "grossly negligent," or "more than careless").

After closely reviewing the administrative record and the parties' briefs, and after hearing oral argument, we conclude that substantial evidence supports the Commission's determination that J.A.M. willfully violated the standard. The record reflects that J.A.M. required its employees to work in dangerous proximity to energized electrical lines. Although J.A.M. does not deny knowing that the working conditions were hazardous and that the safety standard at issue applied, it failed to have the live wires de-energized, rerouted, moved, or insulated, doing essentially nothing to eliminate the risk of electrical shock to its workers. J.A.M.'s attempt to minimize the hazard by directing that the rebar be raised on the 17-foot wide north side of the building, where the high voltage lines only crossed over one corner, and blaming Larry Williams for disregarding its directions, does not adequately refute the evidence that J.A.M. consciously disregarded the standard or exhibited such "reckless disregard for employee safety or the requirements of the law generally that one can infer that . . . the employer would not have cared that the conduct or conditions violated [the standard]." Williams Enter., 13 O.S.H. Cas. at 1257.

Indeed, we find this case similar to <u>Georgia Electric Co.</u>, 595 F.2d 309 (5th Cir. 1979), where a utility company was cited for willfully violating a highway construction safety standard that prohibits the operation of a crane within ten feet of an energized electrical line. A worker was electrocuted when the steel light pole that he was attempting to erect came into contact with an energized line. The company's foreman, knowing of the hazard involved, nonetheless allowed the worker's crew to attempt to erect the pole. The Court, noting that the employer had failed to take steps to acquaint its supervisory personnel with the requirements of the standard, despite knowing of "its obligation to conform to the Act," affirmed the citation, finding that the employer was indifferent to OSHA's requirements and exhibited "disregard for the safety of its employees." <u>Id.</u> at 319-20. The Court rejected the employer's argument that, by instructing its employees to use their "common sense" and not get "too close" to the energized lines, it established adequate work safety rules. <u>Id.</u> at 320; see <u>Central Soya De Puerto Rico, Inc., v. Secretary of Labor</u>, 653 F.2d 38, 39-40 (1st Cir. 1981) (holding that employer that failed to repair a highly corroded grain tower, from which an employee fell, a highly dangerous condition known to supervisory personnel, consciously disregarded OSHA's requirements and showed "[a] degree of indifference to the requirements of the law" sufficient to establish a willful violation); <u>Kent Nowlin</u>

13

Constr. Co., Inc. v. Occupational Safety & Health Review Comm'n, 648 F.2d 1278, 1280-81 (10th Cir. 1981) (holding that, where employer's supervisory personnel knew of hazard involved in using crane within ten feet of electrical lines, but nonetheless decided to proceed and subject its employees to danger of electrocution, employer acted with plain indifference to OSHA's requirements); F.X. Messina Constr. Corp v. Occupational Safety & Health Review Comm'n, 505 F.2d 701, 702 (1st Cir. 1974) (holding that employer that had "obvious" knowledge of trenching standard's requirements but failed to comply, making "private determination that . . . [failing to comply] would not be dangerous," acted with intentional disregard of OSHA's requirements). Cf. Morello Bros. Constr., 809 F.2d at 164 (holding that employer's failure to comply fully with applicable safety standards did not create such an "obviously unsafe" hazard to experienced employees working on roof within sight of a safety monitor as to constitute a willful violation).

Substantial evidence supports the finding that raising the rebar to the north side of the building was not appreciably less dangerous than raising it to the east side. Indeed, as the ALJ noted, it was not particularly safe to use the hole in the floor method, as the 20-foot rebar could still have come in contact with the energized lines. Moreover, J.A.M., which had no written safety program and

14

initially required its employees to raise rebar on what it now recognizes as the more dangerous east side, did not make even a minimal effort to address the problem until ironworking foreman James Stowe refused to endanger the workers further and halted work on that side of the structure. Even at that point, J.A.M. expressed no concern about safety. Indeed, Diaz was so angry about the work stoppage that he threatened not to pay Stowe if he did not go back to work. Stowe was ultimately dismissed for his efforts.

Furthermore, J.A.M.'s attempts to place the blame for its willfulness on the ironworkers, particularly on Larry Williams, is contrary both to the law and to the ALJ's findings of fact. Even if J.A.M. believed, in good faith, that the ironworkers had the skill and the experience to avoid the electrical hazards, that would not excuse J.A.M.'s intentional disregard of and plain indifference to its own duties under OSHA. See Trinity Indus., 16 F.3d at 1153; Georgia Elec. Co., 595 F.2d at 320. See also Western Waterproofing Co., Inc. v. Marshall, 576 F.2d 139, 143 (8th Cir. 1978) (rejecting employer's argument that willfulness was negated because it unilaterally determined that compliance was not necessary). J.A.M.'s arguments about what the ironworkers themselves believed about the danger are simply irrelevant. As the ALJ pointed out, J.A.M.'s alleged reliance on the ironworkers' "experience" was misplaced because "[w]hile these employees may

15

be experienced ironworkers, they are not necessarily experienced in work near power lines and electricity." See Floyd S. Pike Elec. Contractor, Inc. v. Occupational Safety & Health Review Comm'n, 576 F.2d 72, 76-77 (5th Cir. 1978) (holding that employer improperly relied on "inexperienced working foreman [] in charge of an inexperienced crew" to comply with trenching regulation, thus defeating employee misconduct defense); see also Mineral Indus. & Heavy Constr. Group v. Occupational Safety & Health Review Comm'n, 639 F.2d 1289, 1295 (5th Cir. Unit A March 1981) (rejecting employee misconduct defense based on employer's "common sense" approach to safety); Georgia Elec. Co., 595 F.2d at 320 (same).

In light of J.A.M.'s clear acknowledgment of the extreme danger posed by the exposed lines to its employees, evidence of its cavalier attitude to the possibility of serious injury, including death, and its failure to provide a safe method of delivering or handling rebar to avoid contact with the energized lines, we conclude that substantial evidence supports the conclusion of the ALJ that J.A.M. acted willfully under either the "intentional disregard" or "plain

16

indifference" prongs of the <u>Georgia Electric Co.</u> standard.  Accordingly, we **DENY**

J.A.M.'s petition for review and **AFFIRM** the Commission's decision.[5]

      **AFFIRMED.**

---

[5] Finally, J.A.M. argues that because the citation did not charge it with violating the standard on November 5th or 6th, and the Secretary was prohibited by the statute's six-month statute of limitations from citing it for these days, the ALJ's decision is not in accordance with the law. <u>See</u> 29 U.S.C. § 658(c) ("No citation may be issued under this section after the expiration of six months following the occurrence of any violation."). These claims are without merit. The citation specifically alleged that "[o]n or about 11/07/97," J.A.M. willfully violated the standard, and the record plainly reflects that OSHA's citation was issued on April 29, 1998, well before the expiration of the limitations period.

POLLAK, District Judge, dissenting:

I agree with the court's careful legal analysis, and I substantially concur in the court's narration of the facts. But I do not agree with the court's application of the law to the facts. Therefore I respectfully dissent.

The Occupational Safety and Health Act (OSHA) contemplates three grades of violations of the statute and its attendant regulations – "willful"; "serious"; and "not . . . of a serious nature." 29 U.S.C. § 666. An employer who is found by the Occupational Safety and Health Review Commission ("the Commission"), after a hearing before an administrative law judge, to have committed a violation which is "not . . . of a serious nature" may be assessed a civil penalty in an amount not to exceed $7,000. 29 U.S.C. § 666 (c). The maximum civil penalty for a "serious" violation is also $7,000, but assessment of a civil penalty of some amount is obligatory. 29 U.S.C. § 666(b). A "willful" violation calls for a civil penalty of from $5,000 to $70,000. 29 U.S. C. § 666(a). When a "willful" violation causes the death of an employee, the employer is subject to criminal prosecution, with a maximum sentence of six months' incarceration and a fine of $10,000, or a maximum sentence of one year's incarceration and a $20,000 fine for a subsequent conviction. 29 U.S.C. § 666(e).

18

OSHA defines a "serious" violation as one where "there is a substantial probability that death or serious physical harm could result . . . unless the employer did not, and could not with the exercise of reasonable diligence, know of the presence of the violation."  29 U.S.C. § 666(k).  The statute does not define the more flagrant "willful" violation.  As the court points out, in this Circuit the governing case law definition of "willful" violation is that articulated for the Fifth Circuit by Judge Brown in Georgia Electric Co. v. Marshall, 595 F.2d 309, 318 (5th Cir. 1979) and carried forward in Reich v. Trinity Industries, Inc., 16 F.3d 1149, 1152 (11th Cir. 1994): – "intentional disregard of, or plain indifference to, OSHA requirements."

The court today sustains the conclusion of an administrative law judge, adopted by the Commission, that in the case at bar the employer, J.A.M., committed a "willful" violation of OSHA.  The record made before the administrative law judge establishes that J.A.M.'s supervision of the work site was bumbling and, at times, incoherent.  The record unquestionably supports a determination that J.A.M. violated the applicable OSHA regulation – and would, in my judgment, support a characterization of the violation as "serious."  But I do not find in that record substantial evidence of "intentional disregard for, or plain

19

indifference to, OSHA requirements" – the hallmark of a "willful" violation. For this reason I part company with my colleagues.

The OSHA regulation that J.A.M. was charged with violating is 29 C.F.R. § 1926.416(a)(1):

> No employer shall permit an employee to work in such proximity to any part of an electric power circuit that the employee could contact the electric power circuit in the course of work, unless the employee is protected against electric shock by deenergizing the circuit and grounding it or by guarding it effectively by insulation or other means.

The regulation is one which calls on the employer to exercise judgment:  – is the work site one in which an employee must "work in such proximity to any part of an electric power circuit that the employee could contact the electric power circuit in the course of work"?

On November 5, 1997, J.A.M.'s ironworkers began moving bars of rebar from the first to the third story of the three-story structure. What made this a problematic enterprise was the presence, along the structure's east wall, of energized power lines strung about ten feet above the third story. To avoid the power lines, the rebar was, as the court explains, "pass[ed] . . . through a second-floor window and then through a four-foot hole located between the second and third floor. The rebar was passed up length-wise, and was angled at a forty-five

20

degree angle opposite from the building's east wall and away from the energized lines, although it was tall enough that it could have touched the energized lines had it been stood up and/or leaned toward the east wall."

The operation having apparently been completed on November 5, the hole was closed.

The next day – November 6 – when it became apparent that more rebar was required on the third floor, the movement of rebar resumed. But this time, with the hole closed, the rebar was, as the court explains, "rais[ed] to the third floor along the outside of the east wall" – a very risky maneuver which, as the court notes, came to a halt when "the ironworkers' union foreman . . . was informed by an electrician of the severe danger of working along the east wall close to the energized lines." This precipitated a meeting of management officials and union representatives. There is, to be sure, disagreement as to what course of action was agreed upon – passing rebar up the north wall (the J.A.M. understanding) or cutting a new hole between the second and third floors (the union understanding). The one thing that the disagreement plainly establishes is that management and union alike recognized that the rebar which was still to be raised to the third floor should not be passed up the east wall. Carlos Diaz, J.A.M.'s job superintendent, then ordered a carpenter to take rebar that was stacked on the east side of the

21

structure and move it to the north side (presumably, in anticipation of its being raised to the third floor).

On the following day – November 7 – the raising of rebar to the third floor was to resume. Diaz directed foreman Larry Williams to pass rebar up the north side. But Williams did not follow Diaz's directions. Williams and his crew raised rebar up the east side. And Williams died.

The court "find[s] this case similar to Georgia Electric Co." – the case in which the Fifth Circuit defined OSHA willfulness as "intentional disregard of, or plain indifference to, OSHA requirements." In arguing that the two cases are "similar" the court points out that in Georgia Electric:

> a utility company was cited for willfully violating a highway construction safety standard that prohibits the operation of a crane within ten feet of an energized electrical line. A worker was electrocuted when the steel light pole that he was attempting to erect came into contact with an energized line. The company's foreman, knowing of the hazard involved, nonetheless allowed the worker's crew to attempt to erect the pole. The Court, noting that the employer had failed to take steps to acquaint its supervisory personnel with the requirements of the standard, despite knowing of "its obligation to conform to the act," affirmed the citation, finding that the employer was indifferent to OSHA's requirements and exhibited "disregard for the safety of its employees." Id. at 319-20. The Court rejected the employer's argument that, by instructing its employees to use their "common sense" and not get "too close" to the energized lines, it established adequate work safety rules.

22

Georgia Electric's definition of willfulness is binding law for this court. And the finding of willfulness sustained by Judge Brown and his colleagues was, so it seems to me, a proper application of that binding legal rule to the facts of record in Georgia Electric. But, with all respect, I do not think the facts yielding a finding of willfulness in Georgia Electric are "similar" to the facts in the case at bar. In the case at bar the applicable OSHA regulation – 29 C.F.R. § 1926.416(a)(1) – is a generalized admonition:

> No employer shall permit an employee to work in such proximity to any part of an electric power circuit that the employee could contact the electric power circuit in the course of work . . .

By contrast, the OSHA regulation at issue in Georgia Electric – 29 C.F.R. § 1926.550(a)(15) – was a flat directive as to the space to be maintained between power lines and machinery or equipment:

> For lines rated 50 kV. or below, minimum clearance between the lines and any part of the crane or load shall be 10 feet . . .

There was no room for doubt as to the meaning, or the applicability to any given scenario, of the regulation. However, as Judge Brown explained, "[d]espite its awareness of its obligation to conform to the Act and regulations promulgated thereunder, the Company never made any effort to acquaint its supervisory personnel with the OSHA standards. Not one employee with responsibility for the

23

Highway No. 82 project was aware of the minimum distance requirements of §

1926.550(a)(15)." 595 F.2d at 319. Given the substantial difference between the

applicable regulations, together with the fact that in the case at bar the tragic death

of Larry Williams resulted from his ignoring the employer's express instructions, I

suggest that what the court perceives as similarity between the willfulness issue in

Georgia Electric and the willfulness issue in the case at bar is illusory. There is, in

my judgment, less similarity here than meets the eye.

However, there is another aspect of Georgia Electric which seems to me

remarkably similar to the present case. In carefully detailing the events that

preceded the fatal accident of July 10, 1974 at issue in Georgia Electric, Judge

Brown pointed out that the OSHA regulation the company was found to have

violated – 29 C.F.R. § 1926.550(a)(15) – was included in "a copy of the OSHA

safety and health regulations for the construction industry," 595 F.2d at 313, that

had been furnished to the employer in April of 1974, approximately three months

before the July 10, 1974 accident. Judge Brown explained:

> The material was supplied as part of an OSHA
> investigation of an electrocution that occurred on April 8,
> 1974, at a Company work site in Albany, Georgia. As a
> result of that investigation, the Company was cited for
> allowing an employee to work too near an electric power
> circuit that had not been de-energized or otherwise
> guarded. The Company was charged with a serious

24

> violation of [29] C.F.R. § 1926.400(c)(1).  The charge
> was uncontested, and the Company paid a $500 fine.

Id.

29 C.F.R. § 1926.400(c)(1) was the lineal ancestor of 29 C.F.R. §

1926.416(a)(1), the regulation at issue in the present case.[6]  In the context of

Georgia Pacific, the Commission adjudged the employer guilty of a "serious"

violation for, as Judge Brown put it, "allowing an employee to work too near an

electric power circuit" – a "serious" violation that led to an employee's

electrocution.  In the case we are considering today, the record amply supports a

finding that on November 6, 1997 (the second of the three days, when rebar was

"rais[ed] to the third floor along the outside of the east wall") the employer (to

transpose to the present case Judge Brown's words in Georgia Electric) "allow[ed]

employees] to work too near an electric power circuit" – a finding, which,

compatibly with the Commission's assessment of Georgia Pacific's April 8, 1974

misconduct, would surely warrant citation for a "serious" violation.[7]  On

---

[6]  In addition to the renumbering, there were certain non-substantive verbal changes.  The former regulation directed that "[n]o employer shall permit an employee to work in such proximity to any part of an electric power circuit that he may contact the same in the course of his work unless the employee is protected against electric shock by deenergizing the circuit and grounding it or by guarding it by effective insulation or other means."  The present regulation has been rendered genderly neutral through (a) the substitution of "the employee" for "he" and (b) the deletion of "his;" in addition, "could" has replaced "may," and "by effective insulation or other means" has become "effectively by insulation or other means."

[7]  Lest there be any misunderstanding, I am *not* arguing that the Fifth Circuit endorsed the Commission's determination that this earlier dereliction was a "serious" (rather than a "willful") violation.  As Judge Brown's opinion makes plain, Georgia Electric did not challenge the

25

November 7, 1997 – the next day – foreman Larry Williams was electrocuted when he had his crew pass rebar up the east wall rather than the north wall – but this tragic event came about because Williams acted in direct contravention of his employer's instructions. I suppose it is arguable that J.A.M.'s failure to monitor the November 7 conduct sufficiently to prevent the tragedy could be deemed a "serious" violation. But not a "willful" one.

I conclude that the evidence before the administrative law judge does not support a finding that J.A.M.'s violation of 29 C.F.R. § 1926.416(a)(1) was "willful." I am fortified in this conclusion by the fact that, pursuant to the statute, a "willful" OSHA violation that causes the death of an employee gives rise to criminal liability. 29 U.S.C. § 666(e). I am confident that the Congress which crafted OSHA would have viewed J.A.M.'s makeshift methods of raising the rebar with strong disapproval. But I see no reason to suppose that the OSHA Congress would have contemplated that its strong disapproval could be ratcheted up, via an administrative assessment affirmed by a federal court, to a level of malfeasance that constitutes a crime.

Accordingly, I dissent.

---

"serious" citation, so its correctness was not before the Fifth Circuit.